**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **JAMES JORDAN as the surviving SON of decedent, ETHEL JORDAN and as SPECIAL ADMINISTRATOR of the ESTATE OF ETHEL JORDAN**<br>45 Frisco Lane,<br>Haughton, LA 71037<br><br>**Plaintiffs,**<br><br>v.<br><br>**BIG BLUE HEALTHCARE LLC d/b/a RIVERBEND POST ACUTE REHABILITATION**<br>Serve Registered Agent:<br>Cogency Global Inc.<br>2101 SW 21st Street<br>Topeka, KS 66604<br><br>**GATEWAY HEALTHCARE, LLC**<br>Serve Registered Agent:<br>Cogency Global Inc.<br>2101 SW 21st Street<br>Topeka, KS 66604<br><br>**ENSIGN GROUP, INC**<br>Serve Registered Agent:<br>Cogency Global Inc<br>850 New Burton Road Suite 201<br>Dover, DE 19904<br><br>**ENSIGN SERVICES, INC.**<br>Serve Registered Agent:<br>Cogency Global Inc<br>321 W. WINNIE LANE #104<br>Carson City, NV, 89703 | Case No.<br><br>Division No.<br><br>JURY TRIAL DEMANDED |

**IGNITE MEDICAL RESORT RAINBOW
BOULEVARD, LLC**
Serve Registered Agent:
C T CORPORATION SYSTEM
112 SOUTH WEST SEVENTH STREET SUITE
3C
TOPEKA, KS 66603

**IGNITE TEAM PARTNERS, LLC**
Serve Registered Agent:
C T CORPORATION SYSTEM
120 S CENTRAL AVE
Clayton, MO 63105

**Defendants.**

## PLAINTIFFS' COMPLAINT FOR DAMAGES

The Plaintiffs, by and through undersigned counsel, submits this Complaint for Damages against the above-named Defendant, and in further support, states and alleges as follows:

### PLAINTIFF

1.      Ethel Jordan "Resident" suffered from an avoidable pressure in July 2023, at Riverbend Post Acute Rehabilitation, a Kansas skilled nursing facility located at 7850 Freeman Avenue Kansas City, KS 66112 ("The Facility) that caused necrotizing soft tissue infection and her death on September 10, 2023.

2.      Plaintiff, James Jordan, is, and always relevant hereto, an adult over the age of 21 and a resident of Louisiana.

3.      Plaintiff, James Jordan is the Special Administrator of the Estate of Ethel Jordan pursuant to Case No: WY-2023-PR-000497, Wyandotte County.

4.    Plaintiff is a surviving son of Resident, and therefore, a member of the class of individuals authorized to pursue a wrongful death claim pursuant to K.S.A. § 60-1902.

## DEFENDANTS

5.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### BIG BLUE HEALTHCARE LLC d/b/a RIVERBEND POST ACUTE REHABILITATION ("FACILITY")

6.    At all times relevant, Big Blue Healthcare, LLC d/b/a Riverbend Post Acute Rehabilitation ("Ensign Facility"), was a liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Riverbend Post Acute Rehabilitation ("Ensign Facility" or "the Ensign Facility") which is a Kansas skilled nursing facility located at 7850 Freeman Avenue Kansas City, KS 66112.

7.    As such, Ensign Facility was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility

8.    Consequently, Ensign Facility, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

### GATEWAY HEALTHCARE, LLC

9.    At all times relevant to this action, Gateway Healthcare, LLC ("Gateway Healthcare") was a Kansas limited liability company and was engaged in

providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

10.    At all times relevant, Gateway Healthcare, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

11.    Gateway Healthcare, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:

    a.  Staffing budgets.

    b.  The development and implementation of nursing policies and procedures.

    c.  The hiring and firing of the administrator; and

    d.  Training and supervising nursing staff persons.

12.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

13.    Consequently, Gateway Healthcare owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

**ENSIGN SERVICES, INC**

14.    At all times relevant to this action, Defendant Ensign Services is a Nevada company with its principal place of business in California and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Ensign Facility.

15.    At all times relevant to this action, Ensign Services, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, the Facility.

16.    Ensign Services, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled the Facility by exercising final authority over:

     a.  Staffing budgets.

     b.  The development and implementation of nursing policies and procedures.

     c.  The hiring and firing of the administrator; and

     d.  Appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the Facility.

17.    These actions and business decisions had a direct impact on the care provided to all residents including Resident at the Ensign Facility.

18.    Consequently, Ensign Services owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Ensign Facility and breached said duty for all the reasons stated in this Complaint.

**ENSIGN GROUP, INC**

19.    At all times relevant to this action, Defendant Ensign Group, Inc., ("Ensign Group") was a California corporation and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

20.   At all times relevant to this action, Ensign Group, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, the Facility.

21.   Ensign Group, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled the Facility by exercising final authority over:

    a. Staffing budgets.

    b. The development and implementation of nursing policies and procedures.

    c. The hiring and firing of the administrator; and

    d. Appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the Facility.

22.   These actions and business decisions had a direct impact on the care provided to all residents including Resident.

23.   Consequently, Ensign Group owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility and breached said duty for all the reasons stated in this Petition.

**IGNITE MEDICAL RESORT RAINBOW BOULEVARD, LLC**

24.   At all times relevant, Ignite Medical Resort Rainbow Boulevard, LLC ("Ignite Facility"), was an Illinois limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Ignite Medical Resort Rainbow Boulevard, LLC ("Ignite Facility" or "the Ignite Facility") which is a Kansas skilled nursing facility located at 3910 Rainbow Blvd, Suite 400, Kansas City, KS 66103.

25.    As such, Ignite Facility was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility

26.    Consequently, Ignite Facility, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

### ENSIGN DEFENDANTS' JOINT ENTERPRISE/VENTURE

27.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

28.    Defendants Ensign Facility, Ensign Services; Gateway Healthcare, and Ensign Group ("Ensign Joint Venture Defendants") were engaged in a joint venture in that:

  a. The Ensign Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate the Facility, a Kansas licensed nursing home.

  b. The Ensign Joint Venture Defendants had had a common purpose to operate the Facility, a Kansas licensed nursing home.

  c. The Ensign Joint Venture Defendants had a community of pecuniary interest in the operation of the Facility, a Kansas licensed nursing home; and

  d. The Ensign Joint Venture Defendants had had an equal right to a voice in the direction of the operation of the Facility, a Kansas licensed nursing home.

29.    There has been always a close relationship between the Joint Venture Defendants relevant.

30.    Because of the joint venture, the Ensign Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at the Ensign Facility.

**IGNITE'S JOINT VENTURE**

31.     Plaintiff incorporates by reference the allegations previously set

forth and further alleges as follows:

32.     Defendants Ignite Facility and Ignite Team Partners ("Ignite Joint

Venture Defendants") were engaged in a joint venture in that:

      a.   The Ignite Joint Venture Defendants had an agreement, express and/or
          implied, among the members of the group to operate the Facility, a
          Kansas licensed nursing home.

      b.   The Ignite Joint Venture Defendants had had a common purpose to
          operate the Facility, a Kansas licensed nursing home.

      c.   The Ignite Joint Venture Defendants had a community of pecuniary
          interest in the operation of the Facility, a Kansas licensed nursing
          home; and

      d.   The Ignite Joint Venture Defendants had had an equal right to a voice
          in the direction of the operation of the Facility, a Kansas licensed
          nursing home.

33.     There has been always a close relationship between the Ignite Joint

Venture Defendants relevant.

34.     Because of the joint venture, the Ignite Joint Venture Defendants

Joint Venture Defendants owed a joint duty to Resident to use reasonable care for

their safety while under their care and supervision at the Facility.

**JURISDICTION AND VENUE**

35.     Plaintiff incorporates by reference the allegations previously set

forth and further alleges as follows:

36.     Venue is proper in this Court, because the tortious acts complained of

occurred in the United Staes District of Kansas.

37.     Big Blue Healthcare, LLC is a Nevada limited liability company.

38.     The sole member of Big Blue Healthcare, LLC is Ensign Group, Inc.

39.     Ensign Group, Inc., is a Delaware company with its headquarters and principal place of business in California, and therefore, **Big Blue Healthcare, LLC and Ensign Group, Inc**., are **citizens of Delaware and California**.

40.     Gateway Healthcare, LLC is a Nevada limited liability company

41.     The sole member of Gateway Healthcare, LLC, is Ensign Group, Inc.

42.     Accordingly, **Gateway Healthcare, LLC** is a **citizen of Delaware and California**.

43.     **Ensign Services, Inc**., is a Nevada company with its principal place of business in California, and **thus a citizen of Nevada and California**.

44.     Ignite Medical Resort Rainbow Boulevard, LLC and Ignite Team Partners, LLC are Illinois limited liability company registered to do business in the state of Kansas.

45.     The sole member of Ignite Medical Resort Rainbow Boulevard, LLC and Ignite Team Partners, LLC is Barry Carr.

46.     Barry Carr is a citizen of the State of Illinois.

47.     Thus, Ignite Medical Resort Rainbow Boulevard, LLC and Ignite Team Partners, LLC are a citizen of Illinois.

48.     Plaintiff is a citizen of Louisiana.

49.     The Estate of Ethel Jordan is a citizen of Kansas.

50.     Plaintiffs bring their claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

51.    Defendants purposely availed themselves of the protections and/or benefits of the laws in Kansas by conducting business in and committing tortious acts within the state including, but not limited to, failing to ensure that that the Facility had appropriate policies and procedures for its nursing staff; was properly capitalized, funded, and staffed; and that staff received adequate training and supervision while Resident was at the Ensign Facility and Ignite Facility, thereby making jurisdiction proper in this Court.

## AGENCY

52.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

53.    The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

54.    Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

55.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

### Ensign Facility; Gateway Healthcare; Ensign Services And Ensign Group's; Treatment Of Resident

56.    Resident was re-admitted to Facility on August 21, 2023.

57.    Upon information and belief, Resident was at risk for developing pressure injuries.

58.    Resident had just recovered from a previous sacral pressure injury.

59.    Resident required maximum assistance.

60.    The next day, a new pressure injury developed.

61.    Resident required extensive assistance with bed mobility.

62.    Prior to discharge, Resident developed an avoidable sacral pressure injury at Ensign's Facility.

63.    Ensign Facility had insufficient staffing to care for Resident:

| Registered Nurse hours per resident per day | 20 minutes |
|---|---|
| ⬆ Higher numbers are better | National average: 40 minutes |
| | Kansas average: 44 minutes |

**Ignite Facility And Ignite Team Partners' Treatment Of Resident**

64.    Resident was admitted to the Ignite Facility on August 29, 2023.

65.    Upon information and belief, Resident was at risk for developing pressure injuries.

66.    Upon information and belief, Resident was at risk for developing infections from pressure injuries.

67.    On August 30,2023, Resident's care plan at Ignite Facility called for monitoring her skin and reporting changes and a pressure reducing mattress.

68.    On August 31, a social worker at Ignite Facility noted a stage III pressure injury on Resident's coccyx.

11

69.     On September 6, 2023, the Ignite Facility noted a stage III pressure injury.

70.     On September 10, 2023, Dr.'s ordered weekly skin checks for Resident at Ignite Facility.

71.     Resident was 100% dependent on Ignite Facility staff.

72.     Ignite Facility had insufficient staffing to care for Resident.

| Registered Nurse hours per resident per day ↑ Higher numbers are better | 18 minutes National average: 40 minutes Kansas average: 42 minutes |
|---|---|

Nursing home

# Riverbend Post Acute Rehabilitation 

Overall rating:

★☆☆☆☆

73.     On September 7, 2023, Resident was transferred to University of Kansas Hospital.

74.     Resident was examined and found to have a large, non-blanchable, and foul-smelling coccyx wound.

75.     On September 10, 2023, it was determined that Resident suffered from infections from both Bacteroides fragilis and Proteus mirabilis.

76.     Resident passed away on September 10, 2023, from necrotizing soft tissue infection.



**Ensign And Ignite Facilities Deviations Of The Standard Of Care**

77.     Upon information and belief, despite Resident's risk for developing pressure injuries and infection, none of the Facility staff created a Care Plan for resident that implemented the appropriate interventions, including dietary program, and sufficient supervision.

78.     Upon information and belief, none of the Facility staff implemented or applied the appropriate interventions to address Resident's risk of developing

pressure injuries and infection, nor did the Ensign Facility or Ignite Facility staff supervise Resident while he was eating.

79.    Upon information and belief none of the Ensign Facility or Ignite Facility staff:

      a.   Properly assessed Resident's risk of developing pressure injuries and infection.

      b.   Implemented or provided the appropriate interventions to prevent Resident from developing pressure injuries and infection.

      c.   Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

      d.   Monitored Resident's diet and risk of developing pressure injuries and infection.

80.    Upon information and belief, at no point while Resident was a resident at the Ensign Facility or Ignite Facility did any of the Ensign Facility or Ignite Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from Ensign Facility; Ignite Facility, Ignite Team Partners; Gateway Healthcare, Ensign Services, or Ensign Group or any other staff member ever provide any sort of in-service training or clinical education to the Ensign Facility or Ignite Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of developing pressure injuries and infection incidents in residents like Resident.

81.    Upon information and belief, at no point while Resident was a resident at the Ensign Facility or Ignite Facility did any of the Ensign Facility or Ignite Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from Ensign Facility; Ignite Facility, Gateway Healthcare, Ensign Service, or Ensign Group or any other staff member

14

ever implement the appropriate policies and procedures at the Ensign Facility or Ignite Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of developing pressure injuries and infection incidents in residents like Resident.

82.    Upon information and belief, while Resident was a resident at the Ensign Facility or Ignite Facility, the Ensign Facility or Ignite Facility did not have an adequate number of staff working daily at the Ensign Facility or Ignite Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable pressure injuries and infection incident, or monitor and adequately supervise Resident's condition.

**Undercapitalization/Underfunding at the Ensign Facility and Ignite Facility**

83.    Ignite Team Partners; Gateway Healthcare, Ensign Services, and Ensign Group had a duty to provide financial resources and support to the Ensign Facility and Ignite Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

84.    Ignite Team Partners; Gateway Healthcare, Ensign Services, and Ensign Group had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

85.    Upon information and belief, Ensign Facility and Ignite Facility had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

86.    Upon information and belief, no individuals at the Ensign Facility orIgnite Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

87.    Transactions directed by Ignite Team Partners; Gateway Healthcare, Ensign Services, and Ensign Group left the Ensign Facility and Ignite Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

## LEGAL BASIS FOR IGNITE TEAM PARTNERS; GATEWAY HEALTHCARE, ENSIGN SERVICES, AND ENSIGN GROUP'S LIABILITY

### Joint Venture/Enterprise

88.    Ignite Team Partners; Gateway Healthcare, Ensign Services, and Ensign Group are collectively referred to herein as the "Corporate Defendants."

89.    The Corporate Defendants directed, operated and managed the day-to-day functions of their nursing facilities – including the Ensign Facility and Ignite Facility – by developing and implementing policies, practices and procedures affecting all facets of the Ensign Facility and Ignite Facility, including resident care.

90.    These policies manipulate and control the physical and financial resources and prohibit decision making at the Ensign Facility and Ignite Facility level.

91.    This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

16

92.    The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

93.    Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Ensign Facility and Ignite Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the Ensign Facility and Ignite Facility's staff.

94.    The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

**Direct Participation/Individual Actions**

95.    The Corporate Defendants were always material to this lawsuit in the business of managing, owning and operating a network of nursing homes throughout the State of Kansas. One such nursing home was the Ensign Facility and Ignite Facility where Resident was admitted for care and treatment.

96.    At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including the Ensign Facility and Ignite Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing

and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

97.    At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Ensign Facility and Ignite Facility's revenues and expenditures. More particularly, the Corporate Defendants determined:

    a.  The number of staff allowed to work in their chains of nursing homes including the Ensign Facility and Ignite Facility.

    b.  The expenditures for staffing at the nursing homes including the Ensign Facility and Ignite Facility.

    c.  The revenue targets for each nursing home including the Ensign Facility and Ignite Facility.

    d.  The payor mix, and census targets for each nursing home including the Ensign Facility and Ignite Facility.

    e.  Patient recruitment programs and discharge practices at each nursing home including the Ensign Facility and Ignite Facility.

98.    All cash management functions, revenues and expenditure decisions at the nursing home level – including the Ensign Facility and Ignite Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

99.    It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Ensign Facility and Ignite Facility.

100.    The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

101.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

102.    Following the mandates, the Ensign Facility and Ignite Facility functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

103.    Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Ensign Facility and Ignite Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

104.    Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

105.    The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Ensign Facility and Ignite Facility to recruit and retain heavier care, higher pay residents to the Ensign Facility and Ignite Facility even though the needs of the patient population far exceeded the capacity of staff.

106.    At the same time, the Corporate Defendants chose to design, create, implement and enforce operational budgets at the Ensign Facility and Ignite Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

107.   In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Ensign Facility and Ignite Facility, by the State of Kansas, and the federal government.

## Corporate Malfeasance

108.   The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

109.   Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

110.   These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendants and the Ensign Facility and Ignite Facility.

111.   Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Ensign Facility and Ignite Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.   This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

112.     During Resident's residency at the Ensign Facility and Ignite Facility, Resident sustained physical injuries and died, as described in more detail above, because of the acts, omissions, decisions and choices made by the Corporate Defendants in operating the Ensign Facility and Ignite Facility.

113.     During Resident's residency at the Ensign Facility and Ignite Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died because of this failure.

114.     The Corporate Defendants manage, operate and direct the day-to-day operations of the Ensign Facility and Ignite Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Ensign Facility and Ignite Facility. These Corporate Defendants are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

115.     The Ensign Facility and Ignite Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

    a.  Chosen to disregard the duties and responsibilities which the Ensign Facility and Ignite Facility, as a licensed nursing home, owed to the State of Kansas and its residents.

    b.  Created the dangerous conditions described by interfering with and causing the Ensign Facility and Ignite Facility to violate Kansas statutes, laws and minimum regulations governing the operation of said nursing home.

    c.  Superseding the statutory rights and duties owed to nursing home

21

residents by designing and mandating dangerous directives, policies, management and day to day operation of the Ensign Facility and Ignite Facility.

d.  Caused the harm complained of herein; and

e.  Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### COUNT I - (Wrongful Death v. All Defendants)

116.    Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

117.    At all times material hereto Resident was in a defenseless and dependent condition.

118.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

119.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

120.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

121.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

122. These duties required Defendants to have sufficient and qualified staff at the Ensign Facility and Ignite Facility nursing home to ensure the proper care for, and treatment of all residents including Resident.

123. These duties required Defendants to ensure that the Ensign Facility and Ignite Facility's nurses and other staff were properly educated and trained about the care for, and treatment of all residents including Resident.

124. These duties required Defendants to ensure that the Ensign Facility and Ignite Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

125. Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

  a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition.

  b. Failing to adequately assess Resident's risk of developing pressure injuries and infection.

  c. Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition.

  d. Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision.

  e. Failing to have enough staff at the Ensign Facility and Ignite Facility to ensure Resident's needs were being met regarding diet, pressure injury, and infection prevention.

  f. Failing to provide adequate assistive devices and interventions to prevent Resident's pressure injury and infection incidents.

g. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure injury and infection.

h. Failing to provide adequate preventative skin care to Resident.

i. Failing to provide adequate assistance and assistive devices to prevent Resident's pressure injuries and infections.

j. Failing to timely report Resident's changes in condition to a physician.

k. Failing to carry out the instructions of Resident's physician.

l. Failing to adequately, timely and consistently prevent, assess, and treat Resident's pressure injuries and infections.

m. Failing to timely transfer Resident to another facility that could provide adequate care.

n. Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident.

o. Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of dietary needs, pressure injuries and infections in residents like Resident.

p. Failing to carry out and follow standing orders, instructions and protocol regarding the prevention of Resident's pressure injuries and infections.

q. Failing to ensure the nursing home was properly capitalized.

r. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

126. As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

127.    As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiff suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

WHEREFORE, Plaintiff (individually), prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

## COUNT II - (Pain and Suffering by the Estate v. All Defendants)

128.    At all times material hereto Resident was in a defenseless and dependent condition.

129.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

130.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

131.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

132.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

133.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

134.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

135.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

136.    Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a.  Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition.

   b.  Failing to adequately assess Resident's risk of developing pressure injuries and infection.

   c.  Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition.

   d.  Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision.

26

e.  Failing to have enough staff at the Ensign Facility and Ignite Facility to ensure Resident's needs were being met regarding diet, pressure injury, and infection prevention.

f.  Failing to provide adequate assistive devices and interventions to prevent Resident's pressure injury and infection incidents.

g.  Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure injury and infection.

h.  Failing to provide adequate preventative skin care to Resident.

i.  Failing to provide adequate assistance and assistive devices to prevent Resident's pressure injuries and infections.

j.  Failing to timely report Resident's changes in condition to a physician.

k.  Failing to carry out the instructions of Resident's physician.

l.  Failing to adequately, timely and consistently prevent, assess, and treat Resident's pressure injuries and infections.

m. Failing to timely transfer Resident to another facility that could provide adequate care.

n.  Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident.

o.  Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of dietary needs, pressure injuries and infections in residents like Resident.

p.  Failing to carry out and follow standing orders, instructions and protocol regarding the prevention of Resident's pressure injuries and infections.

q.  Failing to ensure the each nursing home was properly capitalized.

r.  Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff, but which is verily believed and alleged will be disclosed upon proper discovery procedures during this litigation.

137.  As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-

economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

138.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

139.    At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2021, 2022, and 2023 created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

140.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.

141.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

142.    The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services*, Inc., No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff (The Estate) prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including non-economic damages for conscious pain and suffering and past medical expenses.

**COUNT III - (Alter Ego v. Defendant Against Ensign Group)**

143.    Plaintiffs incorporate by reference the allegations previously set forth and further alleges as follows:

144.    For the purposes of this Count Defendants Ensign Group are hereinafter referred to as the "Alter Ego Defendant".

145.    Ensign Facility ("Subsidiary") is so dominated by the Alter Ego Defendant that the Subsidiary is a mere instrument of the Alter Ego Defendant and are indistinct from the Alter Ego Defendant.

146.    In fact, the Subsidiary is controlled and influenced by the Alter Ego Defendant in that the Alter Ego Defendant exercised complete control and domination over the Subsidiary finances and business practices.

147.    Specifically, the Alter Ego Defendant' complete control and domination over the Subsidiary caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

148.    Upon information and belief, the Alter Ego Defendant' complete control and domination over the Subsidiary caused the Subsidiary to operate at a loss during the years 2021, 2022, and 2023.

149.    Upon information and belief, the Alter Ego Defendant' complete control and domination over the Subsidiary caused the Subsidiary's liabilities to exceed its assets by during the years 2021, 2022, and 2023.  Specifically:

a.  The Alter Ego Defendant own all or most of the capital stock of the Subsidiary.

b.  The Alter Ego Defendant and the Subsidiary have common directors or officers.

c.  The Alter Ego Defendant finance the Subsidiary.

d.  The Alter Ego Defendant subscribe to all the capital stock of the Subsidiary.

e.  The Alter Ego Defendant caused the incorporation of the Subsidiary.

f.  The Facility has grossly inadequate capital.

g.  The Alter Ego Defendant pay the salaries and other expenses or losses of the Subsidiary.

h.  The Alter Ego Defendant use the property of the Subsidiary as its own; and

i.  The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from the Alter Ego Defendant in the latter's interest.

150.    Thus, the Alter Ego Defendant used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendant' complete control and domination of the Subsidiary depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

151.    Ensign Group, Inc., public filings state that Ensign Group has assets; namely its equity interests in its operating subsidiaries including Ensign Facility By its own admission — in its Securities and Exchange Commission Form 10-K — Ensign Group, Inc., has assets; namely it direct and indirect equity interests in its multiple operating subsidiaries. Per Ensign Group, Inc., federal regulatory filing, Ensign Facility is an Ensign Group asset.

152.    Ensign Group, Inc., controls its subsidiary assets — including Ensign Facility —which it also calls "affiliates."

   a.    Ensign Group, Inc., defines control as the power to direct the management and policies of its affiliates.  In federal regulatory filings, Ensign Group, Inc., defines "affiliate" as "(i) any entity that, directly or indirectly through one or more intermediaries, is controlled by the Company and (ii) any entity in which the Company has a significant equity interest."

   b.    The Ensign Group Inc., Secretary testified that Ensign Group, Inc., has the right to as a shareholder to control the action of its subsidiaries, and its Ensign Group, Inc.'s choice whether it wants to exert control or not. Mr. Keetch has and will testify that Ensign Group, Inc., makes "controlling decisions" for its wholly owned subsidiary Ensign Services, Inc., which provides services to operating subsidiaries.

   c.    The Ensign Group, Inc., Secretary testified that the "buck stop[s]" at the Ensign Group Board. Chad Keetch testified, "I mean, yeah, if you follow the chain of ownership, ultimately I suppose the buck would stop at the Ensign Group Board." Mr. Keetch's frank testimony confirms that the Ensign Group, Inc., Board is the ultimate authority for the operation of Ensign skilled nursing facilities including Ensign Facility.

   d.    Ensign Group, Inc., completes home office cost reports for its skilled nursing facilities. Home office cost reports are submitted to the federal government by nursing home chains that are 'controlled by one organization" according to the federal government (specifically the Centers for Medicare and Medicaid Services), a home office cost report is completed by nursing home chain operations that are "controlled" by one organization."  By completing home office cost reports for its more than 200 skilled nursing facilities – including Ensign Facility — Ensign has repeatedly confirmed its understanding that it controlled those skilled nursing facilities.

153.    Ensign Group, Inc., has employee, including its officers and directors. These employees exercise control of affiliates including Ensign Facility.

   a.   Ensign Group in regulatory filings has defined its" full-time or part time employees" as "officers and directors who are also employees."

154.    Ensign Group Inc., claims that its affiliates-including Ensign Facility are independent.   This claim is false as sworn testimony of Ensign Group officers and administrators, and other employees of Ensign Group skilled nursing facility affiliates has debunked this claim.

155.    Ensign administrators do not control the monies moving in and out of their skilled nursing facilities. There is considerable evidence and testimony that Ensign administrators do not control the monies that flow into (revenue) and out of (expenses) their facilities. A U.S. business entity that does not control its monies cannot be said to control its operations. With respect to Ensign:

   a.   Daily, the revenue collected by Ensign skilled nursing facilities is taken away from the Ensign administrators and swept into a "lockbox" account controlled by Ensign Services, Inc., which is wholly owned by Ensign Group.  Chad Keetch testified that Ensign facilities' accounts receivable is deposited daily into a pooled lockbox account controlled by Ensign Services, Inc., (a wholly owned subsidiary of Ensign Group, Inc.) Ensign Administrator will not know the details of how funds are swept into a bank account controlled by Ensign Administrator, nor did he know which account facility income is deposited. Every day, Ensign administrators across the country lose control of their revenue, because that revenue is swept into accounts belonging to Ensign Services, Inc.; accounts the Ensign facility administrators don't control and can't control. Because Ensign administrators lack day-to-day control of their revenue, they lack control of their operations.

   b.   Ensign administrator can't withdraw money from or write checks off their facility bank accounts.  Chad Keetch, Ensign Executive, testified that Ensign administrators "can't jut, you know, go to the bank and withdrawn money The administrator in this case testified that he is not authorized to write checks and is not authorized to make any withdrawals from the bank account where Medicare and Medicaid receivables are deposited.   Because Ensign administrators aren't

authorized to withdraw money from facility bank accounts the administrator lacks the ultimate authority to control their facilities.

c.  A revolving credit agreement guaranteed by Ensign Group restricts actions of its subsidiary skilled nursing facilities like Ensign Facility. Mr. Keetch testified to the existence of a revolving credit agreement (also known as a credit facility or revolver) guaranteed by Ensign Group, Inc., Per SEC filings this twice amended credit facility restricted the actions of skilled nursing facility affiliates like Ensign Facility including but not limited to incurring indebtedness, granting liens, selling assets, making investments, and engaging in acquisition, merger, or consolidations. The Administrator will testify that that he did not have the authority to enter into loans or establish revolving credit agreement. That i because the authority to do o resides with Ensign Group, Inc., which entered the twice-amended credit facility. When the action of Ensign administrators is restricted by third parties (i.e., Ensign Group Inc., and lenders), then the Ensign administrator lack ultimate authority over and control of their facilities' operations

d.  Ensign skilled nursing expenses are paid from a fund that pools money from hundreds of Ensign skilled nursing facilities. David Connolly, Vice President of Operational Finance, Ensign Services, Inc., testified that funds used to pay expenses for facilities lacking funds are classified as "interest free" loans. However, Connolly was not aware of any signed promissory notes between subsidiary facilities. The use of pooled funds to pay expenses for Ensign facilities and even to issue interest-free loans to fellow facilities-is compelling evidence that Ensign administrators don't control the monies used to fuel their individual facility operations. Daily, Ensign administrators tap into a pool of money that flows from more than 200 facilities. No single Ensign administrator — including the Ensign Facility administrator — controls that pool of money.

156.  Ensign Group, Inc., controls the following additional operational aspects of its subsidiary skilled nursing facilities, including Ensign Facility:

a.  Ensign skilled nursing facility administrators are hired on the authority of the Ensign Group, Inc., CEO and are supervised by persons who work for entities controlled by the Ensign Group, Inc., Sworn testimony of Ensign administrators confirms that they are not their own boss. Cbad Keetch testified that Ensign administrators are hired on the authority of the Ensign Group Chief Executive Officer

b.  A Department of Health and Human Services Corporate Integrity Agreement (CIA) compelled The Ensign Group to create a Compliance Program for its facilities and to appoint a Compliance Officer who "shall be responsible for developing and implementing policies, procedures,

and practices designed to ensure compliance [with the CIA and with Federal health care program requirements." Per the CIA, "Covered Persons·· included all "persons who (1) are involved directly or indirectly in the delivery of resident and or patient care." The CIA also required that the Compliance Officer "shall be a member of senior ma11agcmeul" of The Ensign Group. "shall report directly to the Chief Executive Officer" of The Ensign Group, and "shall make periodic (at least quarterly) reports regarding compliance matters directly to tbc Board of Directors of The Ensign Group. Mr. Keetch testified that Deborah Miller is the Compliance Officer, and an officer of The Ensign Group. Mr. Keetch also testified that if a facility said il wasn't going to comply with the CIA, "we would have to make some decision as to whether we're going to fire those people."

c.  The CIA made Ensign Group explicitly responsive for patient care policies and procedures at Ensign affiliate facilities including Ensign Facility. The CIA was clear that the Compliance Officer-a member of senior management at The Ensign Group who reported to the Ensign Group CEO-was "responsible for developing and implementing policies, procedures and practices [with the CIA] and with Federal health care program requirements." To be clear, the Ensign Group Corporate Compliance Officer was mandated to develop and implement policies and procedures related to the provision of care to residents including but not limited to Ensign Facility' residents. Given this clear mandate from the federal government, which the Ensign Group, Inc., CEO signed, the December 21, 2020. The Ensign Group, Inc., by and through the CIA, was explicitly responsible for the provision of nursing care and other healthcare related services to residents like Mr. Barnes by employees of Ensign Facility.

d.  The CFO of the Ensign Group, Inc., is then CFO for each Ensign skilled nursing facility.

e.  Ensign Group is fully liable for all financial and legal aspects of employee benefit plans.

f.  Employees of Ensign skilled nursing facilities are required to familiarize themselves with the Ensign Group, Inc., Code of Conduct.

g.  Ensign Group's "CAPLICO" values are expected to be followed by employees of Ensign Affiliates. Deborah Miller, Chief Compliance Officer, The Ensign Group, Inc., testified "I am the one that came up with the phrase [CAPLICO 'N Me' which is an anagram for "compliance." Dinah Tolini, former Director of Social Services al an Ensign facility in Arizona, testified that "[t]here were posters that had the CAPLICO plan on it." Ms. Toliui also testified that she knew CAPLlCO was "an Ensign thing." Lena Wortman, — an Ensign affiliate

LPN — testified that she was trained on CAPLICO and the Ensign core values and that she was told it was an expectation of the facility that she follow those Ensign core values. Ms. Wortman also testified that there were CAPLICO signs in "several places in the building." Mandy Blackmon testified that as a Director of Nursing at an Ensign affiliate she needed to follow Ensign's CAPLICO core values.

h.  Ensign skilled nursing facility affiliates obtain professional liability insurance from an entity wholly owned by Ensign Group, Inc., Ensign administrators do not have the authority to obtain their own professional liability insurance. Cost reports for Ensign affiliated skilled nursing facilities indicate that liability insurance is provided by Standard bearer Insurance Company, a wholly owned subsidiary of Ensign Group, Inc., An Ensign Administrator — Doug Haney — testified that he has not participated in the selection of companies who provide insurance services to his facility and doesn't knop the amount of premiums. Fischbeck testified that he doesn't have anything to do with procuring insurance. Ensign Administrator Michael testified that he doesn't know who procures liability insurance, but it's not him. He doesn't know the name of his facility's carrier and doesn't believe he's ever seen the policy.

i.  Ensign administrators do not have the authority to select legal representation for legal claims made against their facilities. The Ensign Group, Inc., General Counsel oversees litigation and litigation management services and informs the Ensign Group, Inc., Board about legal claims. Ensign Administrator Courtney Fischbeck testified that he did not have the authority to select what legal team would represent his facility. Legal claims for Ensign affiliated skilled nursing facilities are overseen by Beverly Wittekind, General Counsel of The Ensign Group. Ms. Wittekind informs The Ensign Group Board regarding claims every quarter.

j.  Ensign administrators can't and don't set their own bonus.

157.  This undercapitalization and understaffing violated Ensign Facility's duties and the applicable standard of care owed by a nursing home operator or manager to the Facility's residents.

158.  As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary – and the Alter Ego Defendant – Resident was harmed and suffered damages, including but not limited to medical bills and expenses, pain,

suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, death, and other damages.

159.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, – and the Alter Ego Defendant – Plaintiffs, suffered damages including, but not limited to, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

WHEREFORE, Plaintiffs, prays for judgment against the Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including, but not limited to, medical expenses, actual damages, the costs of this action, and for such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

STEELE LAW FIRM II, LLC

**_/s/ Jonathan Steele_**
Jonathan Steele KS #24852
Dusty Gleason KS# 79191
2029 Wyandotte, Suite 100
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com
dusty@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office.

**_/s/ Jonathan Steele_**
Attorney for Plaintiff