**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JAMES JORDAN, as surviving son of decedent and
as special administrator of the estate of ETHEL
JORDAN,

        Plaintiff,

        v.

BIG BLUE HEALTHCARE LLC, doing business as
Riverbend Post Acute Rehabilitation, et al.,

        Defendants.

Case No. 25-2264-HLT-BGS

**MEMORANDUM AND ORDER**

This matter comes before the Court on motions for a protective order filed by Big Blue

Healthcare LLC, Gateway Healthcare, LLC, Ensign Group, Inc., Ensign Services, Inc., Ignite

Medical Resort Rainbow Boulevard, LLC, and Ignite Team Partners, LLC. *See* Docs. 97-102.

Plaintiff opposes the motions.[1] *See* Docs. 103-108. For the reasons stated herein, the motions are

**GRANTED in part and DENIED in part**.

I.      **Background**

This is a nursing home negligence and wrongful death case. Plaintiff alleges that Defendants

were negligent in their care of decedent and asserts the following claims against the entities: (1) a

wrongful death claim in his capacity as an heir at law of decedent; and (2) a survival action in his

---

[1] Plaintiff's responses were filed five days after the applicable deadline and exceed the page limitations prescribed by the Local Rules. *See* D. Kan. Rule 7.1(d)(1) ("Principal briefs in support of, or in response to, discovery-related motions must not exceed 10 pages and replies must not exceed 3 pages."). The Ignite Defendants also filed reply briefs that well-exceeded the page limit. The parties neither sought leave of Court nor provided an explanation for the untimely and/or excessive filings. Although the Court declines to strike the briefs at this juncture—because doing so would unnecessarily delay resolution of the pending motions and would not alter the Court's analysis—counsel is advised that future filings that are untimely or that exceed applicable page limitations may be summarily stricken.

1

capacity as the administrator of the decedent's estate. The complaint names six Defendants. Four relate to the Riverbend Post Acute Rehabilitation facility (the "Riverbend Facility"), and two relate to the Ignite Medical Resort Rainbow Boulevard facility (the "Ignite Facility").

### a. The Parties

For clarity, the Court will first summarize the six Defendants by facility and then describe the relationships among them as alleged in the complaint. The following summary is drawn from the operative complaint and does not reflect findings of fact.

The Riverbend/"Ensign" Entities[2]

Big Blue Healthcare, LLC, does business as Riverbend Post Acute Rehabilitation ("Big Blue" or "the Riverbend facility"), a Kansas skilled nursing facility located in Kansas City, Kansas. *Id.* ¶ 6. Gateway Healthcare, LLC, ("Gateway") is alleged to have owned, operated, managed, maintained, and controlled, in whole or in part, the Riverbend facility, including by providing nursing services and exercising control over staffing budgets, nursing policies and procedures, hiring and firing the administrator, and training and supervising nursing staff. *Id.* ¶¶ 9-13. The complaint also names Ensign Services, Inc. and Ensign Group, Inc., alleging that they provided ancillary medical services and, in that capacity, owned, operated, managed, maintained, or otherwise exercised control over the Riverbend facility, in whole or in part. *Id.* ¶¶ 14-23. Specifically, Ensign Services is alleged to have provided IT, legal, accounting, and human resources services to Big Blue. *See* Doc. 105, at 2. The Ensign Group is alleged to be the publicly traded parent corporation that exercised ultimate control over the decedent's care at the Riverbend facility. *See* Doc. 106, at 2.

---

[2] According to the Defendants' diversity disclosure statements, the sole member of Big Blue Healthcare, LLC, is Gateway Healthcare, LLC. The sole member of Gateway Healthcare, LLC, is the Ensign Group, Inc., which is a corporation registered in Delaware with a principal place of business in California. Docs. 30, 33. Ensign Services, Inc., is a corporation registered in Nevada with a principal place of business in California. Its parent company is Ensign Group, Inc. Docs. 15, 32.

<u>The Ignite Entities</u>

Ignite Medical Resort Rainbow Boulevard, LLC, which does business under the same name, is another Kansas skilled nursing facility also located in Kansas City, Kansas.  Doc. 1 at ¶¶ 24-26. The complaint also names Ignite Team Partners, LLC, and alleges it was involved in the ownership, operation, management, maintenance, and control of the Ignite facility.  *Id.* ¶¶ 24-26.  According to the complaint, Ignite Medical Resort Rainbow Boulevard, LLC and Ignite Team Partners, LLC, operated the Ignite facility as a joint venture.

<u>Alleged Relationships Among Defendants</u>

Beyond alleging that certain Defendants owned, operated, managed, maintained, and controlled the facilities where the decedent resided, the complaint also alleges that the Defendants operated through joint ventures and that The Ensign Group, Inc., operated through an alter-ego relationship.  First, the complaint alleges that Riverbend/Ensign Entities operated the Riverbend facility through a joint venture and, as a result, owed a shared duty to exercise reasonable care for the decedent's safety while she was under their care and supervision at the facility.  *See id.* ¶¶ 27-30. Second, the complaint alleges that Ignite Medical Resort Rainbow Boulevard, LLC, and Ignite Team Partners, LLC, operated the Ignite facility through a joint venture and, on that basis, owed a shared duty to exercise reasonable care for the decedent's safety while she was under their care and supervision at the facility.  *See id.* ¶¶ 31-34.  Third, the complaint asserts an alter-ego theory against The Ensign Group, Inc., alleging that it exercised such domination and control over the Riverbend entity that the two were indistinct, including allegations that this control resulted in undercapitalization and understaffing during the decedent's residency.  *Id.* ¶¶ 143-159.

###   b.  **Factual Background**

<u>Relevant Timeline</u>

3

The complaint alleges Ethel Jordan (the "decedent") suffered an avoidable pressure injury at the Riverbend facility in July 2023 that caused necrotizing soft tissue infection resulting in her death on September 10, 2023. *Id.* ¶ 1. The complaint then describes a sequence of events in late August and early September 2023 involving care at both facilities and an eventual transfer to the University of Kansas Hospital.

To begin, the record does not clearly establish the full dates of the decedent's residency at the Riverbend facility. The complaint references an avoidable pressure injury sustained in July 2023 at Riverbend and states that the decedent was "readmitted" to the facility on August 21, 2023, but does not identify the complete period of her stay. The parties' briefing likewise provides inconsistent and incomplete information regarding the relevant timeframe, requiring the Court to review discovery materials to locate more specific representations.

Based on the position statements submitted, the decedent resided at the Riverbend Facility for approximately seven days in July 2023 and 21 days in August 2023. Big Blue's position statement further clarifies that the decedent's stay at Riverbend spanned from July 25, 2023, through August 23, 2023. However, this is different than what is conveyed in Defendants' motions. In Defendant Big Blue's motion for a protective order, Big Blue alleges the decedent resided at Big Blue "off and on between July and August 2023" and that on "August 21, 2023, she was re-admitted to Big Blue." Later in the motion, Big Blue alleges decedent had a "two-day stay" at Big Blue. *See* Doc. 99. For purposes of this Order, and based on the best information available in the record, the Court assumes that the decedent resided at the Riverbend facility during the time frame of July 25, 2023 through August 23, 2023. The Court notes that it should not be required to search through discovery responses to ascertain a basic factual predicate necessary to resolve the motions presented, and counsel are reminded of their obligation to provide clear and consistent factual representations in their submissions.

4

The records from the Riverbend facility indicate that the decedent was at risk for developing pressure injuries, had recently recovered from a prior sacral pressure injury, required maximum assistance, and developed a new pressure injury the following day. Doc. 1 at ¶¶ 57-60. She also required extensive assistance with bed mobility and, before discharge, developed another avoidable sacral pressure injury. *Id.* ¶¶ 61-62. The complaint further describes the facility as insufficiently staffed to meet her care needs. *Id.* ¶ 63.

The decedent was transferred to the University of Kansas hospital on August 23, 2023, for heart related issues. Doc. 99, at 1. On August 29, 2023, she was admitted to the Ignite facility. Doc. 1 at ¶¶ 63-64. At that time, she was at risk of developing pressure injuries and subsequent infections. Her care plan called for monitoring her skin, reporting changes, and use of a pressure-reducing mattress. A social worker documented a stage III pressure injury on her coccyx on August 31, 2023. *Id.* ¶¶ 66-68. A stage III pressure injury was again noted on September 6, 2023, and physicians ordered weekly skin checks. *Id.* ¶¶ 69-70. The complaint further alleges that the facility was insufficiently staffed to meet her care needs.

On September 7, 2023, the decedent was again transferred to the University of Kansas hospital. There, she was examined and found to have a large, non-blanchable, coccyx wound. On September 10, 2023, she was diagnosed with bacterial infections caused by *Bacteroides fragilis* and *Proteus mirabilis.* The complaint states that she died later that day from a necrotizing soft tissue infection. *See id.* ¶¶ 73–76.

<u>Allegations about Care Practices and Resource Allocation</u>

The complaint also includes broader allegations about care planning, interventions, training, and facility resources. For example, it alleges that despite the decedent's risk for pressure injuries and infection, facility staff did not create or implement a care plan addressing those risks and did not appropriately supervise her while she was eating. *Id.* ¶¶ 77-78. It also alleges that management and

staff associated with the facilities and corporate entities did not provide in-service training or clinical education regarding assessment, prevention, interventions, monitoring, and reporting of developing pressure injuries and infection incidents. *Id.* ¶ 80.

In addition, the complaint pleads more than mere generalized assertions of financial control; it includes specific allegations describing how that control was exercised and how it allegedly affected facility operations. Plaintiff alleges that the Defendants implemented centralized cash management and revenue systems through which facility funds were collected, pooled, and redistributed, and that facility-level administrators lacked authority to retain or allocate revenues independently. *See id.* ¶¶ 85–87, 98; *see also* Doc. 94 at 6–8 (seeking testimony of centralized financial oversight and reporting structures). The complaint further alleges that, during the relevant period, the facilities operated with limited cash on hand and negative fund balances, while simultaneously making payments to affiliated entities for management and administrative services. *See* Doc. 1 ¶¶ 88–92; *see also* Doc. 103 at 7. According to Plaintiff, these financial arrangements, together with corporate oversight of budgets and expenditures—constrained the facilities' ability to hire and retain sufficient staff. *See* Doc. 1 ¶¶ 93–97. Plaintiff also alleges that staffing levels, including nursing and CNA hours, were influenced by financial targets and resource limitations imposed at the corporate level, resulting in chronic understaffing rather than an isolated lapse in care. *See id.* ¶¶ 98–103.

<u>Claims Asserted</u>

Based on these factual allegations, the complaint asserts three causes of action against the Defendants.

- <u>Count I—Wrongful Death (against all Defendants)</u>. The complaint asserts a wrongful-death claim against all Defendants, alleging that the decedent was in a defenseless and dependent condition; that she relied on Defendants for safety, protection, care, and treatment; and that Defendants owed duties consistent with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing facility. It further alleges those duties included implementing and enforcing appropriate policies and procedures; ensuring sufficient and qualified staff; ensuring staff were properly educated and

6

trained; and ensuring the facilities were properly capitalized.  *See id.* ¶¶ 116-127.

- Count II—Pain and Suffering (survival claim against all Defendants). The complaint asserts a claim by the Estate for pain and suffering against all Defendants.  It pleads similar allegations, including duties tied to the standards of care for those owning, operating, and managing a skilled nursing facility, as well as duties related to policies and procedures, staffing, training, and capitalization.  *See id.* ¶¶ 128-142.

- Count III—Alter Ego (against Ensign Group, Inc.). The complaint asserts an alter-ego theory against Ensign Group, Inc., alleging domination and control over the Riverbend entity and pleading that this alleged control contributed to undercapitalization and understaffing during the relevant period.  *See id.* ¶¶ 143-159.

### c.  Procedural Background

The Court next summarizes the procedural history relevant to the pending discovery dispute. Plaintiff initiated this action on May 15, 2025.  The Court entered a scheduling order on August 6, 2025.  *See* Doc. 36.  On November 11, 2025, Plaintiff served Rule 30(b)(6) deposition notices on the Defendants.  *See* Docs. 64-69.  Collectively, the notices identified hundreds of topics across the Defendants, including topics addressing corporate structure, ownership, policies and procedures, staffing, budgeting, and decision-making authority.

Following service of the notices, the parties engaged in a series of meet-and-confer discussions to narrow the scope of the proposed topics.  Those discussions did not resolve all disputes.  On December 22, 2025, the Court held an in-person hearing to address multiple discovery issues, including the scope of the Rule 30(b)(6) notices.  *See* Doc. 80.  At the conclusion of that hearing, the Court directed Plaintiff to provide Defendants with a narrowed and revised list of Rule 30(b)(6) topics.  *Id.*  On January 12, 2026, Plaintiff served revised deposition notices on Defendants. Although the revised notices reduced the number of topics, Defendants objected that certain topics remained overbroad, unduly burdensome, or outside the proper scope of Rule 30(b)(6) testimony.

Consistent with the Court's instruction to continue conferring prior to court intervention, counsel met and conferred again on February 2, 2026.  During that conference, Defendants

identified specific topics they contended were not reasonably suited for corporate representative testimony or were better addressed through fact witness depositions. *See, e.g.*, Doc. 97, at 3. On February 9, 2026, Plaintiff served a third iteration of amended Rule 30(b)(6) notices on all Defendants. *See* Docs. 91-96. Although some topics were further limited, Defendants maintain that material disputes remain as to the scope and propriety of certain areas of inquiry.

On February 11, 2026, each Defendant filed a motion for protective order under Fed. R. Civ. P. 26(c), seeking limitations on the Rule 30(b)(6) topics noticed by Plaintiff. Each motion addresses the same underlying dispute—Plaintiff's request for corporate representative testimony—but focuses on topics as they relate to the particular Defendant's role and alleged conduct. Briefing on the motions is complete and the Court is prepared to rule.

## II.    Legal Standard

Fed. R. Civ. P. 26(b)(1) governs the scope of discovery and states that

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at state in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

As such, for the information to be discoverable, the requested information must be nonprivileged, relevant, and proportional to the needs of the case. *Holick v. Burkhart*, No. 16-1188-JTM-KGG, 2018 WL 372440, at *2 (D. Kan. Jan. 11, 2018). Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). *See also Smith v. MCI Telecomm. Corp.*, 137 F.R.D. 25, 27 (D. Kan. 1991); *Rowan v. Sunflower Elec. Power Corp.*, No. 15-9227, 2016 WL 3745680, at *2 (D. Kan. July 13, 2016) (applying *Oppenheimer* after the 2015 amendment).

8

Protective orders are governed by Fed. R. Civ. P. 26(c), which gives the court, "broad discretion to utilize such a protective order to specifically define and/or narrow the disclosure or discovery, including the terms, timing, and method of discovery'." *Orchestrate HR, Inc.*, 2023 WL 2269780, at *1. The Rule provides, in relevant part:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending.... The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> * * *
>
> (A) forbidding the disclosure or discovery;
>
> (B) specifying terms, including time and place, for the disclosure or discovery;
>
> * * *
>
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters; ....

Fed. R. Civ. P. 26(c)(1).

The party seeking a protective order bears the burden of demonstrating good cause. *Layne Christensen Co. v. Purolite Co.*, 271 F.R.D. 240, 244 (D. Kan. 2010). To meet its burden, the moving party must make, "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Jensen v. United States Tennis Ass'n*, No. 20-2422-JWL-TJJ, 2021 WL 6062584, at *1 (D. Kan., Dec. 22, 2021). "The 'good cause' standard of Rule 26(c) is highly flexible, having been designed to accommodate all relevant interests as they arise." *Rohrbough v. Harris*, 549 F.3d 1313, 1321 (10th Cir. 2008) (internal quotation marks omitted). The Court has broad discretion to determine whether a protective order is warranted and to tailor the scope of protection, including by limiting the terms, timing, or method of

9

discovery.  *Orchestrate,* 2023 WL 2269780, at *1.

Because Defendants seek protective orders as to topics designated in six Rule 30(b)(6) deposition notices, the standard governing such depositions are also relevant to the Court's analysis. A Rule 30(b)(6) deposition allows a party to depose a corporation by designating topics for examination and requiring the organization to produce one or more representatives to testify on its behalf.  Pursuant to the rule, the notice

> . . . must describe with reasonable particularity the matters for examination.  The named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify.  Before or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination.  A subpoena must advise a nonparty organization of its duty to confer with the serving party and to designate each person who will testify.  The persons designated must testify about information known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6).

"In a Rule 30(b)(6) deposition, there is no distinction between the corporate representative and the corporation."  *Sprint Communications Co. L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 527 (D. Kan. 2006).  To function effectively, the requesting party must designate, with sufficient specificity, the subject areas for examination that are relevant to the issues in dispute.  *Id.* at 528.  Thereafter, the responding party is required to "make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the deposing party] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed by [the deposing party] as to the relevant subject matters."  *Id.* (*citing Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 638 (D.Minn.2000) (quotations omitted)).  The corporation's duty extends to reviewing information reasonably available to it in preparation for the deposition.  *Orchestrate HR, Inc. v. Blue Cross & Blue Shield of Kansas, Inc.*, No. 19-4007-DDC, 2023 WL 2269780, at *1 (D. Kan. Feb. 28, 2023).

### III.  Analysis

The Court now turns to the disputed Rule 30(b)(6) topics.  There are over 50 disputed topics spanning across six motions.  This order rules on them all—buckle up.

Although certain objections overlap, the Court addresses the disputes by Defendant to ensure clarity and to account for the distinct roles each entity is alleged to have played.  Because the Defendants filed motions for a protective order, the Court will not rule on every single "objection" and instead will decide whether a protective order is warranted pursuant to Fed. R. Civ. P. 26(c) and 30(d).  *Orchestrate HR, Inc.*, 2023 WL 2269780, at *2.

### a.  Big Blue Healthcare, LLC's Motion for Protective Order[3]

The Court begins with Big Blue, the entity that operated the facility where the decedent resided in July-August 2023.  Plaintiff claims that Big Blue had no autonomy to control its own financial course or determine staffing levels.  *See* Doc. 1 at ¶ 85.  The Court first notes that Big Blue organized its motion by individual deposition topic and presents its arguments accordingly.  Plaintiff, inexplicably, organizes its response by broad categories rather than by topic.  This structure makes it unnecessarily difficult to determine which of Plaintiff's arguments correspond to any given topic addressed in the motion.  The Court has attempted to group Plaintiff's arguments as best it can based on the substance of the briefing.  But to the extent Plaintiff's arguments are not clearly tied to a particular topic, the Court will not attempt to construct or develop arguments on Plaintiff's behalf.

---

[3] The Court notes that multiple Rule 30(b)(6) topics directed to the four Riverbend Defendants reference "the time period of the sixty days prior to Resident's stay at the Facility through the duration of her stay."  As discussed above, the record does not clearly establish the precise dates of the decedent's residency at the Riverbend facility, and the Court has determined, for purposes of this order, to treat the relevant period as July 25, 2023, through August 23, 2023.  Accordingly, the Court construes this phrase, as used in topics directed to the Riverbend Defendants, to mean the sixty-day period preceding July 25, 2023—i.e., May 26, 2023—through August 23, 2023.  Unless otherwise noted, this period of time will be referenced as the "Relevant Period" as to these four Defendants.  The Ignite Defendants are addressed separately and are subject to a different timeframe as set forth below.

Big Blue challenges eleven deposition topics (2(ii) and (iii), 11, 13, 15, 16, 17, 18, 19, 20, 21, and 22) in Plaintiff's Third Amended Rule 30(b)(6) Notice (Doc. 92) most of which concern financial structure, cash management systems, capitalization, and staffing metrics during the period preceding and surrounding the stay at Riverbend.  The Court addresses each in turn.

### i.  "Chain Organization" Designation, Guaranties, and Financial Commitments (Topic 2(ii) and (iii))

Topics 2(ii) and 2(iii) seek testimony concerning the relationship between Big Blue and The Ensign Group, Inc., as of the time of decedent's residency at the Riverbend facility, i.e., July 25, 2023-August 23, 2023.  Specifically,

- **Topic 2(ii):** The Ensign Group, Inc.'s designation as the "chain organization" (Chain Number HB1576) on the Facility's CMS 2540 cost report and what this designation reflects about the corporate relationship; and

- **Topic 2(iii):** any guaranties, credit support, or financial commitments made by The Ensign Group, Inc. for the benefit of Big Blue.

Doc. 92, at 3.

Big Blue contends that these topics lack reasonable particularity and are not proportional to the needs of the case.  *See* Doc. 99, at 5.  With respect to Topic 2(ii), Big Blue contends the term "chain organization" is undefined in the notice and requires speculation.  Big Blue asserts that, at most, the term appears in the Medicare Provider Reimbursement Manual, which it characterizes as containing non-binding interpretive guidance.  According to Big Blue, the topic fails to identify whose interpretation of "chain organization" is sought—Big Blue's or CMS's—and would require Big Blue to speculate regarding a governmental agency's interpretive rules.  Big Blue therefore argues the topic is vague and not stated with reasonable particularity under Rule 30(b)(6).

As to Topic 2(iii), Big Blue argues that the request is not relevant and is disproportionate to the claims asserted.  Big Blue contends that the complaint does not allege that it obtained credit or financial commitments from lenders, nor does it include specific allegations concerning lending

12

practices.  In Big Blue's view, the allegations of deficient care during a brief period of residency do not justify discovery into broader financial arrangements between affiliated entities.  Big Blue maintains that the topic seeks intrusive financial information unrelated to the pleaded claims and would result in undue burden and oppression.

In response, Plaintiff contends that the disputed topics are central to his theory of liability. Plaintiff characterizes the unifying issue in the case as whether the Ensign Group exercised control over Big Blue's staffing decisions.  According to Plaintiff, the complaint alleges that The Ensign Group and related entities exercised substantial corporate authority over Big Blue's operations, including through financial controls and hierarchical oversight.  Plaintiff argues that testimony concerning the "chain organization" designation and any guaranties or financial commitments bears directly on the nature and scope of that corporate relationship and the mechanisms through which authority may have been exercised.

The Court finds that Topics 2(ii) and 2(iii) are sufficiently particularized and seek relevant discovery.  Topic 2(ii) specifically references The Ensign Group's designation as the "chain organization" on Big Blue's CMS Form 2540 cost report.  Seeking testimony regarding what that designation reflects about the corporate relationship between the entities is relevant and is sufficiently particularized.[4]  Further, as to Defendant's vagueness argument, the topic does not require the witness to speculate about CMS policy; rather, it seeks testimony regarding Big Blue's understanding of the designation reflected on its own regulatory filing.  A corporate representative may testify regarding the company's understanding of the designation and the nature of the

---

[4] The Court does not interpret the regulatory chain designation as establishing corporate control.  Rather, the designation is a factual classification appearing in the provider's regulatory filings, and testimony explaining the company's understanding of that designation may assist in understanding the corporate relationships reflected in those filings.

corporate relationship reflected in the cost report, including information reflecting corporate

relationships or activities involving affiliated entities.  *See Sanofi-Aventis v. Sandoz, Inc.*, 272 F.R.D. 391,

394–96 (D.N.J. 2011) (requiring a corporation to prepare a Rule 30(b)(6) witness using information

reasonably available to it, including information from affiliated entities on which it relied upon in

regulatory submissions).

Topic 2(iii), which seeks testimony regarding guaranties, credit support, or financial

commitments made by The Ensign Group for Big Blue's benefit, is likewise relevant to Plaintiff's

theory that affiliated entities exercised financial control over the Riverbend facility's operations.  The

information sought bears directly on Plaintiff's theory of financial control and is narrowly tailored to

the period of decedent's residency at the facility.  Consequently, Big Blue has failed to demonstrate

good cause for a protective order as to these topics and its request for a protective order as to

Topics 2(ii) and 2(iii) is **denied**.[5]

### ii.   Centralized Cash Management, Sweep Accounts, and Lockbox Accounts (Topic 11)

Topic 11 seeks testimony regarding the centralized cash management system, sweep

accounts, or lockbox accounts, used for Big Blue, for the Relevant Period, specifically: whether the

Facility's accounts receivable were deposited into accounts not solely controlled by the

Facility; the identity of the person or entity that controlled such accounts; the process by

which the Facility obtained funds to pay its operating expenses (specifically payroll, vendor

invoices, supplies, and other costs); whether any person or entity outside the Facility had

authority to approve, deny, or delay disbursements; any inter-facility loans or transfers of

---

[5] When the Court denies a request for protection as to a particular topic, it has determined that good cause has not been shown.  Conversely, when the Court grants a request for protection, it has found that good cause exists.  For the sake of efficiency, the Court will not repeat this finding for each topic but simply notes it at the outset.

funds; whether any such loans or transfers were documented by promissory notes specifying repayment terms and interest; and any written agreements, policies, or procedures governing the centralized cash management system.  Doc. 92, at 6.

Big Blue first argues that the topic is duplicative because substantially similar cash management topics were directed to multiple affiliated Defendants, including Gateway Healthcare, LLC, The Ensign Group, Inc., and Ensign Services, Inc.  In its view, requiring multiple entities to prepare corporate representatives on overlapping financial systems would result in cumulative discovery warranting limitation.  Big Blue further contends that the detailed mechanics of its bank accounts and cash management systems are neither relevant nor proportional to the claims asserted. It argues that the complaint contains only generalized allegations regarding undercapitalization and corporate control and does not specifically reference lockbox accounts, sweep accounts, Medicare reimbursements, or interfacility loans.  According to Big Blue, the decedent's brief stay does not justify discovery into sensitive and proprietary banking arrangements, and that Plaintiff may explore corporate control and financial oversight through less intrusive means.

In response, Plaintiff contends that the requested testimony is directly relevant to his theory of corporate control.  In his response, Plaintiff points to financial data in Big Blue's CMS cost reports in support of his relevance argument.  Plaintiff alleges the reports show that Big Blue carried a negative fund balance of -$366,028 in 2022, which reduced to -$752,233 by fiscal year 2023. During the same years, worksheet A-8-1 shows that Big Blue made related-party payments exceeding $1.7 million annually, that the home office allocation alone was $750,457 in 2022 and $777,388 in 2023, portions of which were disallowed by Medicare as exceeding allowable costs.  Plaintiff also cites deposition testimony from Chad Keetch, the Ensign Group's Executive Vice President, confirming that affiliated facilities are required to deposit accounts receivable into lockbox accounts controlled by the corporate parent and must request operating funds through a revolving credit

arrangement subject to corporate approval.  Plaintiff contends that these financial arrangements are directly relevant to his allegations that centralized cash management constrained Big Blue's ability to maintain adequate staffing.

The Court finds that Topic 11 seeks relevant discovery.  Testimony regarding the existence and operation of such systems may bear directly on the nature and extent of corporate control over Big Blue's financial affairs.  Underlying financial transactions and relationships among affiliated entities may be relevant when determining the nature and purpose of a provider's financial arrangements.  *Cf. Hinsdale Hosp. Corp. v. Shalala*, 50 F.3d 1395, 1401 (7th Cir. 1995) (explaining that determining whether a provider's borrowing reflects a legitimate financial need may require examining the underlying transactions and relationships that created the need for the loan).  The subparts are also not intended to be exhaustive; rather, they identify discrete areas over a narrow time frame that are relevant to the nature and extent, or lack thereof, of control exercised over Big Blue's financial affairs and what impact, if any, that may have had on staffing decisions.

Further, the Court is not persuaded that the topic warrants protection because it is duplicative.  Each entity may possess distinct institutional knowledge regarding the operation of the financial systems at issue, and the mere fact that that similar topics were directed to affiliated defendants does not render the discovery cumulative as to Big Blue.  Nor does the Court find the discovery disproportionate at this stage, notwithstanding the relatively brief duration of the decedent's stay.  Accordingly, Defendant has not met its burden and the request for a protective order as to Topic 11 is **denied**.

### iii.  Communications Regarding Staffing and Quality Concerns (Topic 13)

Topic 13 seeks testimony regarding all notifications between the Riverbend and Ensign entities, or a cluster partner, concerning staffing levels, staffing shortages, agency usage, quality concerns, survey deficiencies, or budget constraints for the Relevant Period, specifically, daily or

16

weekly operational reports submitted by the Facility Administrator, any communications regarding the Facility's nursing hours per patient day, any communications regarding the Facility's use of agency staffing; and any communications regarding quality metrics or concerns.[6]  Doc. 92, at 7.

Big Blue contends that the topic is unduly burdensome because it identifies two different timeframes—sixty days prior to the decedent's stay and six months preceding the last day of her stay—which, in its view, significantly expands the scope of preparation required for a corporate representative.  It further maintains that the terms "operational reports" and "quality metrics and concerns" are overbroad and encompass matters beyond the wound-care allegations at issue.  Big Blue therefore requests that the Court limit the topic in both timeframe and subject matter.

In response, Plaintiff contends that Topic 13 is neither vague nor overbroad and instead seeks routine operational communications commonly generated in nursing home management. Plaintiff asserts that "operational reports" in this context refers to identifiable categories of documents such as daily census reports, staffing level updates (including HPPD metrics), incident reports, infection surveillance data, staffing vacancy reports, and quality dashboards.  Plaintiff argues that these materials are not undefined abstractions but standard forms of inter-entity reporting within a chain organization.  Plaintiff further contends that communications and reports flowing between Big Blue and affiliated corporate entities are central to his theory of corporate control, as they are probative of corporate knowledge concerning staffing adequacy and demonstrate how staffing levels, financial constraints, and quality concerns were communicated within the corporate hierarchy.

The Court finds that Topic 13 seeks relevant discovery.  Communications between Big Blue and affiliated entities regarding staffing levels, staffing shortages, agency usage, quality concerns,

---

[6] The topic as drafted also references a six-month timeframe preceding the last day of the decedent's stay. The Court understands this to be a drafting inconsistency and addresses that timeframe separately below.

survey deficiencies, and budget constraints may be relevant to demonstrate a defendant's knowledge regarding the adequacy—and potential dangers—of staffing at a facility, particularly where the plaintiff alleges that operational or managerial decisions resulted in understaffing. *See Murray v. ManorCare of Topeka KS, LLC*, 2020 WL 1819884, at *7 (D. Kan. Apr. 10, 2020) (holding that communications regarding staffing levels, budgets, and operational oversight were relevant to whether defendants had knowledge of inadequate and potentially dangerous staffing conditions). These communications may also serve as evidence of knowledge and oversight, which is central to corporate liability theories.

The Court is not persuaded that the subject matter of the topic is impermissibly vague or overbroad to warrant protection, as the types of operational reports described by Plaintiff appear to reflect routine categories of facility reporting. The Court does agree, however, that the notice references two different timeframes—sixty days prior to the decedent's stay and six months preceding the last day at the facility—which creates unnecessary ambiguity. The Court therefore modifies the scope of the topic to encompass the shorter proposed period beginning sixty days preceding the decedent's admission through the duration of her stay at the facility. Subject to that limitation, Big Blue's request for a protective order as to Topic 13 is **granted in part**.

### iv. Bonus, Incentive, and Profit-Sharing Arrangements (Topic 15)

Topic 15 seeks testimony regarding the bonus, incentive, or profit-sharing arrangements for the Facility Administrator and other management staff at Big Blue Healthcare, LLC, during the Relevant Period, specifically: any metrics tied to financial performance, revenue, census, occupancy, or profitability; any metrics tied to labor costs or nursing hours per patient day; any metrics tied to quality outcomes; who established the bonus criteria; and the source of funds for bonus payments. Doc. 92, at 8.

Big Blue represents that it is willing to produce a witness to testify generally as to whether

18

such incentive arrangements exist.  However, it argues that inquiry into the specific financial terms, performance criteria, and funding mechanisms for such bonuses is not relevant to the claims asserted and would intrude into sensitive and proprietary information.  Big Blue further contends that disclosure of detailed compensation structures could create competitive concerns, particularly given that other defendants operate facilities in the same market.

In response, Plaintiff argues that incentive and bonus arrangements for the Facility Administrator and management staff are directly relevant to his theory of corporate control over staffing decisions.  Plaintiff contends that compensation structures tied to financial performance or labor costs may demonstrate how corporate entities exercised influence over staffing levels and that, if administrator bonuses were linked to labor cost containment or other financial metrics, such arrangements could bear on whether staffing decisions were shaped by financial targets rather than resident care considerations.  Plaintiff further asserts that such discovery is probative of whether affiliated corporate entities monitored and enforced financial performance metrics at the Riverbend facility.  In Plaintiff's view, this line of inquiry is not merely collateral to the claims but instead relates to the alleged mechanisms through which staffing levels may have been constrained.

The Court finds that Topic 15 seeks relevant discovery.  Compensation structures that reward cost-cutting or other financial targets may bear on whether staffing decisions were influenced by financial considerations.  This is particularly true because compensation incentives may serve as a mechanism of corporate influence.  The Court is not persuaded that the requested testimony is irrelevant or disproportionate to the needs of the case, nor does the Court find that the confidential nature of compensation arrangements warrants a protective order.  Any legitimate confidentiality concerns may be addressed through the existing protective order governing discovery.

To the extent Big Blue contends that disclosure of precise compensation figures would raise competitive concerns, the Court agrees that such figures need not be disclosed.  Testimony

19

regarding the existence and structure of incentive programs and the metrics used to determine such compensation is sufficient.  Accordingly, Big Blue's request for a protective order as to Topic 15 is **granted in part**.

### v.  CMS Cost Reports and Home Office Allocations (Topic 16)

Topic 16 seeks testimony regarding CMS Form 2540-10 (Skilled Nursing Facility Cost Report)[7] for Big Blue for the cost reporting period January 1, 2022, through December 31, 2022, specifically: the identity of all persons involved in preparing or certifying the report; and, regarding the "HOME OFFICE ALLOCATION" reported on Worksheet A-8-1, the Administrative & General Home Office Allocation and Skilled Nursing Facility Home Office Allocation, what specific services these allocations represent; and how these amounts were calculated.  Doc. 92, at 8.

Big Blue argues that Plaintiff's reliance on CMS Form 2540-10 is misplaced because the form serves a narrow, regulatory purpose unrelated to the claims asserted.  According to Big Blue, the cost report exists solely to facilitate fair and equitable reimbursement for services rendered to Medicare beneficiaries and must be completed using CMS-defined accounting methods.  Big Blue contends that Plaintiff is attempting to "weaponize" a third-party regulatory form designed for Medicare reimbursement to obtain binding corporate testimony about the Riverbend facility's broader financial affairs, and emphasizes that the complaint contains no allegations concerning Medicare or Medicaid reimbursement and does not allege that information submitted in the cost reports establishes undercapitalization, understaffing, or deficient care.  Big Blue further contends that the 2022 cost report falls outside the relevant timeframe, that the request lacks reasonable particularity, and that testimony regarding how home office allocations were calculated for Medicare

---

[7] CMS Form 2540-10 is a Medicare cost report used by skilled nursing facilities to report their financial and operational data to the Centers for Medicare & Medicaid Services (CMS).  It is typically filed annually and is used by CMS to evaluate reimbursement, compliance with regulations, and facility operations.

reimbursement purposes is not relevant to the claims asserted and would impose an undue burden.

Plaintiff responds that CMS Form 2540-10 is not vague, but rather a defined regulatory term appearing in mandatory cost reports submitted to CMS under federal regulations. Further, the financial data and deposition testimony summarized in Topic 11 applies here and supports the same relevance finding.

The Court finds that Topic 16 seeks relevant discovery. CMS Form 2540-10 reflects the facility's reported financial structure, including home office allocations that identify services provided by affiliated entities and how costs were distributed to the facility. Testimony regarding who prepared the report and how those allocations were calculated may bear on the nature and extent of corporate involvement in the facility's financial and operational management, and it is not an undue burden for a corporate representative to explain the company's own filings.

The Court is not persuaded that the regulatory purpose of the cost report renders the information irrelevant, nor does the fact that the 2022 cost report predates the decedent's stay preclude discovery, as financial arrangements existing during that period may provide relevant background regarding the Riverbend facility's financial structure. Because the topic references a specific regulatory filing and worksheet, the Court finds it stated with reasonable particularity. To the extent Big Blue contends that testimony would require interpretation of CMS regulations, the Court construes the topic as seeking testimony regarding Big Blue's preparation and understanding of its own cost report. Big Blue has not met its burden to establish that protection is warranted and has a duty to prepare a corporate representative to testify about information within the company's knowledge. *Layne Christensen Co.*, 271 F.R.D. at 244; *Orchestrate HR, Inc.*, 2023 WL 2269780, at *1. Accordingly, Big Blue's request for a protective order as to Topic 16 is **denied**.

> **vi. Operating Losses and Related Communications (Topic 17)**
> **Negative Balance and Capital Contributions (Topic 18)**
> **Bank Accounts, Loans, and Cash Transfers (Topic 19)**

21

Topics 17, 18, and 19 each seek financial information regarding the Riverbend facility's reported operating losses, fund balance, and cash transfers.  Big Blue raises substantially similar objections to each — that the topics exceed the relevant timeframe, seek information unrelated to the wound-care allegations, and would require preparation on sensitive financial matters disproportionate to the needs of the case.  Plaintiff responds in each instance that the requested testimony bears on his theory that affiliated corporate entities exercised financial control over the facility in a manner that constrained staffing.  Further, as discussed in connection with Topics 11 and 16, Big Blue's own CMS cost reports and the Keetch deposition testimony provide support for Plaintiff's contention that the facility's financial arrangements and related-party payments are directly relevant to his corporate control and understaffing allegations.  The Court addresses each topic in turn.

Topic 17 seeks the following testimony regarding the Riverbend facility's reported consecutive net operating losses in 2022 and 2023 (Worksheet G-3, Line 31): whether the cost reports are accurate; what factors contributed to the operating losses; communications between the Riverbend/Ensign entities regarding operating losses; and any actions taken or proposed to address the losses.  Doc. 92, at 9.

The Court finds that this testimony may bear on Plaintiff's theory that affiliated corporate entities exercised financial control over the Riverbend facility's operations and that such control affected staffing levels.  Notably, Plaintiff alleges that corporate decisions left Big Blue with a negative fund balance of over $700,000.  Doc. 103, at 6 n. 8.  Communications regarding operating losses and related financial conditions may therefore be relevant to whether corporate entities were aware of financial constraints affecting facility operations.  The Court agrees, however, that the two-year timeframe identified in the topic is broader than necessary.  To ensure that the discovery

22

remains proportional to the needs of the case, the Court limits the communications portion of the topic (subsection (c)) to the six months preceding the decedent's last day at the facility.  Big Blue's request for a protective order as to Topic 17 is **granted in part**.

Topic 18 seeks testimony concerning the negative difference between the Riverbend facility's General Fund Balance as of December 31, 2022 (Worksheet G, Line 52), and December 31, 2023 (Worksheet G, Line 52), specifically: whether Big Blue agrees that the General Fund Balance declined between these periods; if so, whether capital contributions were made or requested from other defendants during the year 2023; and how the facility continued to operate despite the negative fund balance.  Doc. 92, at 9.

The Court concludes that the requested testimony falls within the scope of discovery. Information concerning the Riverbend facility's reported financial condition—including whether the facility operated with a negative balance and whether capital contributions were made—may bear on whether affiliated entities exercised financial oversight or control affecting the Riverbend facility's available operating resources.  Testimony explaining the meaning of those financial entries and the circumstances surrounding any capital contributions may provide context for evaluating Plaintiff's allegations concerning corporate financial practices and staffing conditions.

The topic is also sufficiently particular because it refers to financial information reflected in the Riverbend facility's regulatory cost reports for the identified years rather than a generalized inquiry into the facility's finances, and preparing a corporate representative to explain those reported financial figures does not impose a burden disproportionate to the needs of the case.  Big Blue's request for a protective order as to Topic 18 is therefore **denied**.

Topic 19 seeks testimony regarding the Riverbend facility's report of negative 'Other Current Assets' as of December 31, 2022 (Worksheet G, Line 9), and $(1,331,325) as of December 31, 2023 (Worksheet G, Line 9), specifically: whether the reporting is accurate; how the Facility

arrived at a negative Other Current Assets balance; whether this balance represents amounts transferred to related entities as defined by the Centers for Medicare and Medicaid Services through lockbox accounts, sweep accounts, or intercompany loans; the terms of any intercompany loans including interest rates and repayment terms; how cash was transferred from the Facility while it was operating at a loss with a negative fund balance; who authorized these transfers; and whether facility management had authority to prevent or control these transfers.  Doc. 92, at 9.

The Court finds that Topic 19 overlaps substantially with Topic 11, which already addresses centralized cash management systems and related financial transfers, and that testimony regarding detailed banking mechanics or account structures would be cumulative and not proportional to the needs of the case.  However, testimony regarding whether the "negative current asset" balances resulted from capital contributions or intercompany loans may bear on how funds were managed and whether the Riverbend facility retained sufficient operating capital.  Accordingly, the Court limits Topic 19 to testimony regarding loans to or from Big Blue and capital contributions or transfers affecting the Riverbend facility's operational funding during the relevant period. Accordingly, Big Blue's motion for a protective order as to Topic 19 is **granted in part**.

### vii.   Home Office Fees and Management Fees (Topic 20)

Topic 20 seeks testimony regarding the Riverbend facility's claimed home office allocation fees to Gateway Healthcare in 2022 (Worksheet A-8-1) while reporting a net operating loss (Worksheet G-3, Line 31), and the facility's similar claim of home office fees while there was a net loss in 2023, specifically, whether the reporting in the 2022 and 2023 cost reports referenced above are accurate; why management fees were not reduced when the Facility was operating at a loss; services provided by Gateway Healthcare in exchange for these fees; how management fees were calculated; whether the management fees equated to the market value of services received; and authority of facility management to negotiate or reduce management fees. Doc. 92, at 10.

24

Big Blue argues that Topic 20 is not stated with reasonable particularity because it references both "home office fees" and "management fees," without clarifying whether those terms are intended to be synonymous or distinct, leaving uncertainty as to the precise subject of inquiry. Big Blue further contends that the topic improperly seeks hypothetical or opinion testimony regarding whether management fees equated to the market value, which it argues would require speculation and comparative analysis beyond the knowledge of a corporate representative.

In response, Plaintiff argues that inquiry into the nature of home office and management fees bears on the scope of corporate control and oversight over Big Blue, including whether centralized administrative functions affected operational decision-making at the facility. Plaintiff further notes that CMS regulations governing related-party transactions require facilities to report whether such costs exceed the amount a prudent buyer would pay for comparable services, making inquiry into the market value of management fees appropriate.

The Court finds that Topic 20 seeks relevant discovery in part. Testimony regarding the existence, structure, and calculation of home office fees or management fees paid by Big Blue as set forth in subparts (a)-(d) and (f) may bear on the financial relationship between the facility and affiliated entities and is relevant to Plaintiff's corporate control allegations. Big Blue's motion for a protective order as to those subparts is **denied**. The Court agrees, however, that subpart (e), whether such fees equated to "market value", is not stated with reasonable particularity and may require opinion testimony beyond the knowledge of a corporate representative. *See Miller v. Union Pac. R. Co.*, No. 06-2399-JAR-DJW, 2008 WL 4724471, at *2 (D. Kan. Oct. 24, 2008) ("[T]he designated corporate representative does not give his or personal opinion like an individual does, but rather presents the corporation's position on the topic."). Accordingly, Big Blue's request for a protective order as to Topic 20, subpart (e) is **granted**. Big Blue shall produce a witness prepared to testify regarding the existence, structure, and calculation of any home office or management fees

25

paid by the facility, but testimony requiring comparison to market value or industry benchmarks is not required.

### viii.    CNA Hours, Budget Constraints, and Staffing Metrics (Topics 21 and 22)

Topics 21 and 22 both concern staffing levels at the Riverbend facility and are addressed together.  Topic 21 alleges that between 2022 and 2023, CNA hours per patient declined while total patient days increased, and seeks testimony regarding the following: whether the allegation is accurate and, if so, why CNA staffing per patient day declined while census increased; the budget constraints limiting CNA staffing; the impact on hands-on care including repositioning, skin checks, and incontinence care, CNA-to-patient ratios during various shifts; frequency of repositioning and turning for immobile residents; whether insufficient CNA staffing contributed to pressure injuries; and requests to increase CNA staffing and responses.

Topic 22 alleges that in the six months prior to decedent's last day at the facility, total nursing hours per patient day declined, and seeks testimony regarding the following: whether the allegation is accurate and if so, why total nursing hours per patient day declined; budget constraints limiting total nursing staffing; communications regarding staffing adequacy; correlation between nursing hours and resident outcomes including pressure injuries; and staffing levels during August– September 2023.  Doc. 92, at 10.

Big Blue objects to both.  As to Topic 21, it argues that the two-year timeframe is overbroad given the duration of the decedent's stay and contends that any inquiry into CNA staffing should be limited to the sixty days preceding her stay through the end of that stay.  As to Topic 22, Big Blue argues that the six-month timeframe encompasses a period it characterizes as non-relevant, that the intended recipients of the communications sought are unclear, and that the topic seeks irrelevant and overbroad information about other residents and outcomes outside of pressure injuries.

26

In response, Plaintiff contends that staffing data spanning 2022 and 2023 is relevant because the complaint alleges systemic understaffing, not an isolated incident confined to the decedent's specific dates of residency. Plaintiff argues that evidence of CNA hours and staffing patterns over time bears on whether inadequate staffing was routine rather than anomalous. According to Plaintiff, limiting discovery to the precise dates of the decedent's stay would prevent meaningful examination of whether broader staffing trends contributed to the alleged deficiencies in care.

The Court finds that both topics seek discovery relevant to Plaintiff's allegations that the facility was inadequately staffed. *See Billings v. ManorCare of Wichita, KS LLC*, No. 2:21-cv-02295-KHV-TJJ, 2022 WL 4016572, at *3–4 (D. Kan. Sept. 2, 2022) (finding discovery relevant where the plaintiff alleged inadequate staffing caused the decedent's death, including information bearing on the defendant's knowledge of staffing levels and related operational decisions). Topic 21 concerns decreases in CNA hours between 2022 and 2023 and the impact of those changes on staffing ratios and care. Topic 22 seeks testimony regarding total nursing hours per patient day during the six months preceding the decedent's last day at the Riverbend facility. Because Plaintiff alleges systemic understaffing, information regarding staffing levels and staffing metrics may bear directly on whether inadequate staffing existed during the relevant period and whether it was chronic rather than isolated.

The Court, however, agrees that to the extent the topics seek testimony regarding "resident outcomes" in a generalized sense, they are broader than necessary. Discovery concerning other residents must be limited to pressure injuries experienced by other residents during the relevant period. *See Billings*, 2022 WL 4016572, at *3–4 (permitting discovery where it bore on alleged inadequate staffing and its effect on resident care). Accordingly, the topics are limited to staffing metrics and, to the extent Plaintiff seeks information concerning other residents, such inquiry shall be confined to outcomes related to pressure injuries.

Further, the two-year timeframe identified in Topic 21 is broader than necessary. To ensure the discovery remains proportional to the needs of the case, Topic 21 is limited to CNA staffing levels during the six months preceding the decedent's last day at the Riverbend facility, consistent with the time frame applicable to Topic 22. The Court finds that the six-month timeframe identified in Topic 22 is reasonable and proportional in light of Plaintiff's allegations. Further, the Court construes the "communications regarding staffing adequacy" to be referring to interfacility communications and internal communications between staff. Accordingly, Big Blue's request for a protective order as to Topics 21 and 22 are **granted in part**.

**In conclusion, Big Blue's motion for protective order (Doc. 99) is granted in part and denied in part as set forth above.**

### b. Gateway Healthcare, LLC's, Motion for Protective Order

Gateway is alleged to be the "cluster leader" that is "directly responsible for overseeing Big Blue Healthcare's operations" which includes "making decisions regarding staff allocation, budget allocation, operational performance, and quality metrics across the facilities it oversees." Doc. 104. Plaintiff alleges Gateway jointly operated the Riverbend facility. Gateway challenges Topics 3, 4(a)(vi), 5, 10, 11, 12, 14, and 15(d) in Plaintiff's Third Amended Rule 30(b)(6) Notice (Doc. 93).[8] These topics generally concern cluster governance, oversight of the Facility Administrator, financial reporting relationships, centralized cash management, bonus structures, and corporate relationships with affiliated entities. The Court addresses each disputed topic below.

---

[8] Plaintiff provides argument regarding Topic 1. However, Gateway Healthcare LLC did not move for a protective order as to Topic 1, and its motion does not challenge it. Nor is this topic addressed anywhere in its brief. Accordingly, there is no dispute before the Court regarding Topic 1. To the extent Gateway Healthcare LLC may have previously asserted objections to this topic, such objections are deemed abandoned where they are not pursued in the motion for protective order. *See Booth v. Davis*, No. 10-4010-RDR, 2014 WL 3542059, at *1 (D. Kan. July 17, 2014) (finding objections not raised in response to a motion to compel were abandoned). The Court therefore does not consider any such objections further.

### i.  Cluster Governance and Organizational Structure (Topic 3)

Topic 3 seeks testimony regarding the cluster structure used by Gateway to supervise Big Blue during the Relevant Period, specifically: the identity of the "cluster" to which Big Blue was assigned; the names, titles, and employers of all individuals who served as "cluster partners"; the identity of any "cluster leader"; the frequency, format, and typical agenda of cluster meetings; topics discussed at cluster meetings; any written charter, guidelines, or policies governing the cluster's authority and responsibilities; and how decisions affecting Big Blue were made within the cluster structure. Doc. 93, at 4.

Gateway argues that the topic is duplicative of a request directed to Big Blue and that requiring multiple Defendants to prepare corporate representatives to testify regarding the same subject would impose unnecessary burden.  It further asserts that the topic encompasses facilities and matters not involved in the current litigation and that "cluster-level meetings" would likely involve operational and business issues unrelated to the claims asserted.

Plaintiff responds that the topic is not duplicative because Gateway and Big Blue occupy different roles within the alleged cluster structure.  According to Plaintiff, Big Blue can testify only from the perspective of a member facility—such as what meetings it attended, what reports it submitted, and what directives it received—whereas Gateway, as the cluster leader, can testify regarding its oversight of Big Blue, the information it reviewed, and the decisions or approvals made at the cluster-management level.  Plaintiff further points to deposition testimony by Mr. Keetch confirming "that Ensign-affiliated facilities are organized into 'clusters' of four to five facilities, that each cluster holds weekly meetings with 'full access to each other's financials,' and that facilities within a cluster are held accountable for performance through the cluster structure."  Doc. 104 at 3. Plaintiff also notes that Big Blue's CMS cost reports identify Gateway as the chain home office. Plaintiff asserts that other facilities participating in the same cluster does not render the topic

29

irrelevant because the cluster structure is the mechanism through which Gateway allegedly exercised oversight of Big Blue.

The Court finds that Topic 3 seeks information relevant to Plaintiff's allegations that affiliated corporate entities exercised oversight and control over Big Blue's operations. *See Grano v. Pinnacle Health Facilities XXXIII, LP*, No. 17-11-JAP/LF, 2017 WL 4712212, at 6–8 (D.N.M. Oct. 18, 2017) (finding that a related entity providing legal and regulatory compliance services, including cost report certification, played a "vital role" in the operation and management of a nursing facility). The Court is not persuaded by Gateway's argument that the discovery is cumulative. Big Blue can testify only regarding its role as a facility participating in the cluster, whereas Gateway can testify regarding the oversight exercised at the cluster-management level. Testimony from Gateway therefore concerns a distinct corporate perspective that cannot be obtained from Big Blue alone.

To the extent clarification is warranted, the Court construes Topic 3 as limited to testimony regarding the structure and operation of the cluster as it relates to the supervision and oversight of Big Blue Healthcare LLC, and not as permitting a broad inquiry into the operations of other facilities within the cluster. With that clarification, Gateway's request for a protective order as to Topic 3 is **denied**.

### ii. Administrator Supervision and Performance (Topic 4(a)(vi))

Topic 4(a)(vi) seeks testimony regarding Gateway's role in hiring, evaluating, supervising, and terminating facility administrators at Big Blue, during the Relevant Period, specifically: the process by which the Executive Director/Administrator of Big Blue was selected and hired, and who made or approved the hiring decision; whether the Administrator was hired by, or at the direction of, any individual or entity other than Big Blue; the individual or entity to whom the Administrator reported; how the Administrator's performance was evaluated and who conducted such evaluations; whether cluster partners had authority to recommend or effectuate termination of

30

the Administrator; any performance evaluations, performance improvement plans, or disciplinary actions involving the Administrator; and Gateway's involvement in Administrator compensation decisions.  Doc. 93, at 5.

Gateway argues that the complaint contains no allegations concerning the Administrator's job performance or any employment-related claims.  It contends that the topic is therefore not relevant to the claims asserted and exceeds the proper scope of discovery.

Plaintiff responds that the topic does not concern employment claims but rather goes to the scope of Gateway's alleged oversight of Big Blue's operations.  Plaintiff argues that Gateway, as cluster leader, exercised control over staffing and operational decisions at the facility, and the Administrator was the individual through whom that oversight was implemented.  Plaintiff contends that testimony regarding whether Gateway evaluated the Administrator's performance, imposed improvement plans, participated in compensation decisions, or possessed authority to recommend or effectuate termination bears directly on the extent and effectiveness of Gateway's supervision. Plaintiff argues that such information may demonstrate either that Gateway identified deficiencies in the Administrator's performance but failed to act, or that Gateway failed to meaningfully evaluate the Administrator despite its oversight role.

The Court finds that Topic 4(a)(vi) seeks discovery relevant to Plaintiff's allegations that Gateway exercised oversight and control over Big Blue's operations.  As to Gateway's argument that these topics relate to employment issues not at issue in the case, the Court disagrees.  Plaintiff does not seek discovery regarding employment claims but rather the scope of Gateway's alleged supervisory authority over the Riverbend facility's leadership.  Evidence during the relatively narrow period of time concerning whether Gateway evaluated the Administrator's performance, participated in compensation decisions, or possessed authority to recommend disciplinary action or termination may bear on the extent of Gateway's oversight and control over facility operations.  Because the

31

Administrator served as the primary managerial official responsible for implementing operational and staffing decisions at the Riverbend facility, Gateway's role in supervising that position is relevant to Plaintiff's theory of corporate control.  Accordingly, Gateway's request for a protective order as to Topic 4(a)(vi) is **denied**.

### iii.    Financial Reporting Relationship and Benchmarks (Topic 5)

Topic 5 seeks testimony regarding the financial reporting relationship between Big Blue and Gateway during the Relevant Period, specifically: what financial reports the Facility was required to submit to Gateway Healthcare, LLC; how frequently such reports were submitted; the format and categories of content contained in such reports; how Gateway used these reports to monitor the Facility's operations; and any benchmarks, targets, or thresholds Gateway established for the Facility's financial performance and staffing.  Doc. 93, at 5.

Gateway seeks a protective order to the extent the topic requests testimony regarding the specific contents of financial reports and associated targets.  Gateway distinguishes between acknowledging whether such reports exist and testifying to their substantive financial data, arguing that inquiry into actual financial figures and proprietary report contents exceeds the scope of the allegations in the complaint and intrudes into sensitive business information.

Plaintiff responds that the requested testimony is directly relevant to the complaint's allegations that Gateway exercised financial control over Big Blue's operations.  According to Plaintiff, the format and content of financial reports sent from Big Blue to Gateway, as well as any benchmarks or performance thresholds established by Gateway, would reveal what aspects of the Riverbend facility's finances Gateway monitored and what standards it imposed.  Plaintiff argues that such information is necessary to understand the mechanisms through which Gateway allegedly directed financial decisions affecting staffing and operations.

Plaintiff further relies on Mr. Keech's testimony that performance benchmarks—including

financial and clinical metrics tied to administrator bonuses—were established at the cluster level where Gateway operated.  Plaintiff also argues that Gateway's assertion that the information is proprietary is unpersuasive because Big Blue's financial condition is already reflected in publicly filed CMS cost reports, and that if Gateway established financial targets for the facility despite its negative financial position, those targets may bear on whether financial priorities influenced staffing and care decisions.

The Court finds that Topic 5 seeks discovery relevant to Plaintiff's allegations that Gateway exercised financial oversight over Big Blue's operations.  Gateway's proprietary-information objection does not justify a protective order.  Information regarding the financial reporting structure between Big Blue and Gateway may bear on the scope of Gateway's alleged oversight and control, and any confidentiality concerns may be addressed through the existing protective order.  The Court does note an important limitation, however.  As framed, Topic 5 targets the reporting structure and oversight mechanism, specifically, the existence, frequency, format, and general categories of financial reports, and the nature of any benchmarks or targets Gateway imposed, rather than testimony of line-by-line financial figures contained in the reports.  The topic does not, on its face, seek testimony about actual dollar amounts, account balances, or granular financial data appearing in the reports.  Testimony at the deposition should be understood accordingly, and the parties should be guided by this limitation if disputes arise regarding the permissible scope of questioning under this topic.  Subject to that clarification, Gateway's request for a protective order as to Topic 5 is **denied**.

### iv.  Centralized Cash Management and Financial Control (Topics 10 and 11)

Topic 10 seeks testimony, for the Relevant Period, regarding the centralized cash management system, sweep accounts, or lockbox accounts used by Gateway for Big Blue,

33

specifically: how the Facility's accounts receivable flowed through accounts which Gateway had access to; Gateway's control over or access to such accounts; the process by which the Facility obtained funds to pay operating expenses; any inter-facility loans or transfers of funds regarding Facility; and Gateway's role in financial transactions on behalf of the Facility.

Topic 11 seeks testimony regarding Gateway's access to and control over bank accounts of Big Blue, for the Relevant Period, specifically: whether Gateway had signatory authority on any of the Facility's bank accounts; whether Gateway could direct disbursements from the Facility's accounts; whether Gateway could access the Facility's accounts receivable or revenue; and any written agreements or arrangements governing Gateway access to the Facility's funds.  Doc. 93, at 7-8.

Gateway argues that these topics are duplicative of similar requests directed to Big Blue and incorporates by reference Big Blue's arguments that such inquiries seek proprietary financial information that is neither relevant nor proportional to the claims asserted.

Plaintiff responds that the requested testimony is not duplicative and is directly relevant to the complaint's allegations that Gateway exercised centralized control over Big Blue's financial operations.  Plaintiff contends that Topics 10 and 11 seek information about the mechanisms— sweep accounts, bank account access, lockbox arrangements, signatory authority, and payment authorization—through which Gateway allegedly controlled cash management, revenue, and expenditures at the Riverbend facility.  Plaintiff asserts that this testimony is relevant because Gateway, as the designated chain home office and cluster-level management entity, occupied a different role in the financial hierarchy than Big Blue and is therefore uniquely positioned to explain how those centralized systems operated and what oversight or authority Gateway exercised over Big Blue.  Plaintiff further argues that financial records and prior testimony indicate that cash flows, home office allocations, and related financial controls were managed through corporate-level

34

systems, making testimony regarding those arrangements relevant to understanding the degree of corporate control over the facility's operations and resources.

The Court finds that Topics 10 and 11 seek discovery relevant to Plaintiff's allegations that Gateway exercised centralized financial oversight over Big Blue's operations. Gateway's contention that this discovery is cumulative of the discovery directed to Big Blue is unpersuasive. Big Blue and Gateway occupied separate and distinct roles within the cluster structure: Big Blue doing business as the Riverbend facility, while Gateway served as the cluster-level management and chain home office entity. Testimony from Gateway therefore concerns a distinct corporate perspective concerning the operation and oversight of centralized financial operations that is not obtainable from Big Blue.

Moreover, it is well established that parties are not limited to a single witness's account of disputed facts, particularly where multiple corporate entities were involved in the same transactions or operational decisions. *See Martley v. City of Basehor, Kansas*, No. 19-2138-DDC-GEB, 2021 WL 4134307, at *2–3 (D. Kan. Sept. 10, 2021) (finding that Rule 30(b)(6) testimony is not unreasonably cumulative merely because it addresses subjects covered in prior written discovery and deposition testimony); *see also Foreclosure Mgmt. Co. v. Asset Mgmt. Holdings, LLC*, No. CIV.A. 07-2388-DJW, 2008 WL 3895474, at *5 (D. Kan. Aug. 21, 2008) ("[I]t is a generally accepted practice for litigants to engage in successive forms of discovery such as the production of documents and depositions"). Requiring a party to accept as complete and accurate the testimony of a single corporate representative, particularly where the entities involved had distinct perspectives on the same financial arrangements would be inconsistent with the purpose of discovery.

To the extent any of the testimony involves confidential financial information, there is an existing protective order in place that is sufficient to address those concerns. Further, the Court notes that the topics as described target the financial relationship between the parties – who held what authority, how systems were structured, and what processes were in place to govern the flow

of funds.  The topics do not seek testimony of specific financial figures, dollar amounts, or account balances, and testimony at the deposition should be understood accordingly.  Accordingly, Gateway's request for a protective order as to Topics 10 and 11 is **denied**.

### v.  Bonus, Incentive, and Profit-Sharing Arrangements (Topic 12)

Topic 12 seeks testimony regarding all bonus, incentive, or profit-sharing arrangements between Gateway and administrators or staff at Big Blue, for the Relevant Period, specifically: any financial performance metrics affecting bonuses; any census or occupancy metrics affecting bonuses; any labor cost or staffing metrics affecting bonuses; who established the bonus criteria; and the source of funds for bonus payments. Doc. 93, at 8.

Gateway argues that the topic is duplicative of Topic 15 directed to Big Blue and incorporates those arguments by reference.  It further contends that the requested metrics and financial data constitute proprietary information and that inquiry into the source of bonus payments intrudes into sensitive financial matters not proportional to the claims asserted.

Plaintiff contends that Gateway, as the cluster-level management entity, established the bonus criteria, set the performance benchmarks, and determined the source of funding, while Big Blue's personnel were merely recipients of those bonuses.  Plaintiff notes that Mr. Keetch testified that bonuses were tied to cluster-level benchmarks involving both financial and clinical performance and that performance at other facilities within the cluster could affect bonus eligibility.  Plaintiff further contends that discovery regarding bonus metrics and benchmarks may reveal the incentive structure through which Gateway allegedly influenced facility operations, including staffing and financial performance.

The Court finds that incentive structure is relevant to Plaintiff's theory of the case.  If Gateway established bonus criteria related to financial performance metrics, those criteria may have created financial incentives that influenced staffing and operational decisions at the facility level.

36

Testimony from Gateway goes to the design and administration of the incentive structure itself, information that Big Blue, as recipients, are not positioned to provide.  As with Topics 10 and 11, Gateway's cumulative objection is unpersuasive.  The relevant distinction is not just that they are separate entities, but they occupied different positions with respect to the bonus arrangements at issue.  Further, Gateway's proprietary objection does not justify a protective order.  Any confidentiality concerns can be adequately addressed by the existing protective order.  Accordingly, Gateway's request for a protective order as to Topic 12 is **denied**.

### vi.   Communications and Reports Regarding the Riverbend Facility's Finances (Topic 14)

Topic 14 seeks testimony, for the Relevant Period, of the following: (a) communications Gateway received from the facility regarding financial distress; (b) reports provided to Gateway regarding facility financial performance; and (c) whether Gateway ever reduced its fees collected from the Facility.  Doc. 93, at 9.

Gateway argues that the phrase "financial distress" is undefined and lacks the reasonable particularity required under Rule 30(b)(6), leaving the scope of the request unclear.  It further contends that the request for reports regarding financial performance is overly broad and could encompass a wide range of documents unrelated to the allegations in the complaint.  According to Gateway, the complaint's generalized undercapitalization allegations do not justify intrusive discovery into proprietary financial reporting.

Plaintiff responds that the terms "financial distress" and "reports" are sufficiently clear in context and relate directly to the facility's documented financial condition during the relevant period. Plaintiff contends that Big Blue's CMS cost reports show substantial negative fund balances, minimal cash on hand, and significant staffing reductions, which together demonstrate that the facility was experiencing financial difficulties.  Plaintiff argues that communications and reports

37

regarding the facility's financial performance to Gateway will show what information Gateway received about the facility's condition and how it responded.  Plaintiff further maintains that the "reports" referenced in subpart (b) have a commonly understood meaning in the context of corporate oversight of healthcare facilities, including items such as financial statements, profit-and-loss reports, census data, staffing expense reports, and variance analyses.

The Court finds that Topic 14 seeks discovery relevant in part to Plaintiff's allegations that Gateway exercised oversight of Big Blue's financial condition and operations.  Subparts (a) and (c) are not impermissibly vague.  Read in context, the phrase "financial distress" identifies a sufficiently defined subject matter and satisfies the reasonable particularity requirement of Rule 30(b)(6). Testimony regarding what communications Gateway received from the Riverbend facility's financial condition and whether Gateway ever reduced its fees in response, bears directly on what Gateway knew or didn't know and how it responded in its oversight role.  Gateway's proprietary objection is addressed by the existing protective order.

Subpart (b) requires a limiting instruction.  As written, the subpart could be read to encompass any written communication touching on financial matters that could loosely be characterized as "reporting" on financial performance.  The Court is not inclined to construe the topic so broadly.  Accordingly, the Court limits the term "reports" to structured financial reporting documents generated and transmitted in the context of corporate oversight.

Accordingly, Gateway's request for a protective order as to Topic 14 is **granted and denied in part.**

### vii.    Staffing Levels During August–September 2023 (Topic 15(d))

Topic 15(d) seeks testimony regarding whether Gateway approved staffing levels at the Riverbend facility during August–September 2023.  Doc. 93, at 9.

Gateway objects to the scope of the request arguing that testimony regarding staffing levels

38

in September 2023, when decedent was no longer a resident, is irrelevant and should be precluded.

Plaintiff responds that the inclusion of September 2023 is appropriate because the complaint alleges systemic corporate control and undercapitalization rather than isolated negligence tied to specific dates of the decedent's stay. Plaintiff argues that conditions at the facility in the weeks immediately following the decedent's transfer—including staffing levels, budget performance, and operational circumstances—may reflect the same systemic conditions that existed during the decedent's residency and therefore provide relevant context. Plaintiff also contends that Gateway's actions or inactions in the period following the decedent's deterioration and transfer may bear on the extent of Gateway's ongoing oversight of the facility, and that the addition of a single month beyond discharge is a limited and reasonable given the nature of the allegations.[9]

The Court finds that Topic 15(d) seeks discovery relevant to Plaintiff's allegations that Gateway exercised oversight and control over staffing decisions at the Riverbend facility. *See Murray*, 2020 WL 1819884, at *5–6 (holding that staffing data over a broader time period was relevant where the plaintiff alleged systemic understaffing). Gateway's relevance and proportionality arguments are not persuasive in the context of the claims asserted. Here, Plaintiff alleges systemic understaffing and corporate control rather than isolated negligence tied solely to the precise dates of the decedent's stay. Evidence regarding Gateway's staffing approval authority in September 2023 may provide context on whether the staffing conditions that existed during her residency reflected a

---

[9] The Court notes that Plaintiff's response cites *Murray v. ManorCare, Inc.*, 975 F. Supp. 2d 1002, 1012 (D. Kan. 2013), which does not appear to correspond to the authority discussed in the briefing. The Court understands Plaintiff to be referring to *Murray v. ManorCare of Topeka KS, LLC*, No. 19-2148-DDC-KGG, 2020 WL 1819884 (D. Kan. Apr. 10, 2020). Plaintiff cited that case correctly in the proceeding sentence. He also correctly refers to it throughout his other responses. *See, e.g.*, Docs. 103 at 13, 25; 104 at 11, 15–16; 106 at 13; 107 at 12; 108 at 15. The Court also notes the same incorrect citation appears once in Doc. 105 at 11. Given the volume of briefing submitted across six discovery motions, the Court attributes the discrepancy to carelessness rather than any more concerning issue. The Court therefore takes no further action but cautions counsel to carefully review citations in future filings.

consistent operational posture by Gateway, or whether any changes occurred in that period are probative of Gateway's oversight role and authority. *See id.* The evidence is relevant to Plaintiff's theory of corporate control. Further, the timeframe is very narrow and only encompasses an additional month beyond decedent's discharge. Accordingly, Gateway's request for a protective order as to Topic 15(d) is **denied**.

**It is therefore ordered that Gateway's motion for a protective order (Doc. 100) is granted in part and denied in part.**

### c. Ensign Services, Inc.'s Motion for Protective Order

The Court next addresses Ensign Services, Inc. ("ESI"). ESI challenges Topics 4, 5, 6(a)(vii), 13(a)(i), 15(a)(ii), 17, 19, 22, 24, 25, 27, and 28 in Plaintiff's Third Amended Rule 30(b)(6) Notice (Doc. 91).[10] ESI is alleged to be at "the corporate epicenter" of this case as "the shared services entity providing accounting, IT, legal, and human resources services" to Big Blue and other facilities within the Ensign corporate family. Doc. 105, at 2. The disputed topics concern human resources investigations, corporate reporting and analytics, accounts receivable management, board-level actions, cash management systems, capital contributions, intercompany transfers, and CMS cost report designations. The Court addresses each category below.

### i. Centralized Cash Management (Topic 4)

Topic 4 seeks testimony, for the Relevant Period, regarding ESI's role in the centralized cash management system regarding Big Blue specifically: management of facility funds; ESI's designation

---

[10] Plaintiff provides detailed argument regarding Topics 2, 8, 9, 10, 12, 14, 16, 18, 19, 20, 21, 22, 23, 24, and 26. However, Ensign Services did not move for a protective order as to those topics, and its motion does not challenge them. Nor are those topics addressed anywhere in Ensign Services' brief. Accordingly, there is no dispute before the Court regarding those topics. To the extent Plaintiff's response addresses matters not raised in the motion, the Court does not consider those arguments. Moreover, to the extent Ensign Services may have previously asserted objections to those topics, such objections are deemed abandoned where they are not pursued in the motion for protective order. *See Booth v. Davis*, No. 10-4010-RDR, 2014 WL 3542059, at *1 (D. Kan. July 17, 2014) (finding objections not raised in response to a motion to compel were abandoned).

as "borrower representative" under the revolving credit facility; ESI's authority to direct disbursements from centralized accounts; and the process by which Big Blue obtained funds to pay operating expenses. Doc. 91, at 4.

The Court notes that Defendants frequently incorporate arguments by reference across multiple topics rather than presenting discrete, topic-specific analysis. This practice is not helpful and is generally disfavored, as it requires the Court to search through the briefing to identify the precise basis for each objection. *See Sandoval v. Jones*, No. 11-5022, 2011 WL 2321451, at *4 n.6 (10th Cir. June 14, 2011) (recognizing that attempts to incorporate arguments by reference are disfavored). At the same time, Plaintiff does not always provide a topic-specific response and instead advances arguments in a more generalized manner across the briefing. Under ordinary circumstances, the Court would not consider arguments that are not clearly presented in connection with a particular issue. However, given the breadth of the topics at issue, the volume of briefing, and the substantial overlap in the arguments raised, the Court declines to disregard Defendants' incorporated arguments or deem Plaintiff's responses waived. Instead, the Court has reviewed the briefing as a whole and, where necessary, considers arguments raised elsewhere to fully capture each party's respective positions on the disputed topics.

Here, ESI argues that the topic is substantially similar to Topic 11 directed to Big Blue and is therefore duplicative and cumulative. ESI incorporates by reference Big Blue's arguments that such inquiry seeks proprietary financial information and is not relevant or proportional to the claims asserted. Plaintiff's response brief does not specifically address Topic 4. Instead, Plaintiff's discussion groups Topics 4-6 and focuses on human-resources services, staffing decisions, and HR investigations, which are not subjects reflected in Topic 4 and instead correspond to Topic 6. Accordingly, the Court evaluates Topic 4 based on the subject matter actually described in the deposition notice, and considers Plaintiff's arguments directed to Big Blue's Topic 11, which present

41

substantially similar issues.

Plaintiff's broader theory of the case provides the relevant backdrop. Plaintiff contends that ESI designed, operated, and controlled the cash management system, and that ESI determined the timing and amount of cash distributions among facilities and the corporate parent. Plaintiff further contends that this system resulted in ESI maintaining tight control over cash reserves and directing available funds toward corporate management fees rather than facility-level staffing. In support, Plaintiff references testimony from Mr. Keetch indicating that ESI, as the service center, submits financial projections to The Ensign Group for review, and that this system generated approximately $1.7 million in costs for 2022 and 2023, during a period when the facility carried a negative fund balance. Doc. 105, at 6 n.6.

The Court finds that Topic 4 seeks relevant discovery. Testimony regarding the existence and operation of such systems may bear directly on the nature and extent of corporate control over Big Blue's financial affairs. The subparts are targeted, discrete, and the temporal scope is narrow. They address the financial relationship between ESI and Big Blue, specifically whether ESI managed facility funds, what authority ESI had as borrower representative, and whether ESI could direct disbursements, etc. These topics all bear directly on Plaintiff's theory that ESI exercised some degree of control over the flow of funds to and from the Riverbend facility. *Cf. Hinsdale Hosp. Corp. v. Shalala*, 50 F.3d 1395, 1401 (7th Cir. 1995) (explaining that evaluating the legitimacy of a financial arrangement may require examining the underlying transactions and relationships that created the need for the borrowing).

ESI's duplication objection is unpersuasive for reasons previously stated in connection with other Topics. Each entity may possess distinct institutional knowledge regarding the operation of the financial systems at issue, and the mere fact that that similar topics were directed to affiliated defendants does not render the discovery cumulative. Accordingly, Defendant has not met its

burden and the request for a protective order as to Topic 4 is **denied**.

### ii.  Payroll Processing, Accounts Payable, and Financial Operations (Topic 5)

Topic 5 seeks testimony regarding ESI's involvement in payroll processing, accounts payable, and other financial operations for Big Blue, for the Relevant Period, specifically: how payroll is processed; how vendor payments are processed; what authority ESI has to delay, prioritize, or modify payments; and who at ESI has access to the Facility's bank accounts.  Doc. 91, at 4.

As noted above, the parties frequently rely on incorporation by reference and do not always present arguments on a topic-by-topic basis.  Given the overlap in issues and the volume of briefing, the Court has reviewed the briefing as a whole and considers arguments raised elsewhere as necessary to capture each party's position.

ESI represents that it has produced its Independent Contractor Agreement with Big Blue and staffing punch-detail data for the Relevant Period.  ESI argues that additional testimony concerning the mechanics of payroll and vendor payment systems is not relevant or proportional to the needs of the case and would be burdensome in light of the documents already produced. Plaintiff's response does not directly address the substance of Topic 5.  Plaintiff's response focuses primarily on ESI's alleged role in human resources functions, staffing decisions, and HR investigations at the facility.  But Plaintiff does argue in support of topics involving payroll and financial operations elsewhere throughout the brief.

The Court concludes that Topic 5 seeks relevant and proportional discovery.  Plaintiff alleges that corporate entities exercised control over the Riverbend facility's financial and operational functions in a manner that affected staffing levels and resident care.  Testimony regarding ESI's role in payroll processing, accounts payable, and related financial operations, including its authority over payments and access to facility accounts, may bear directly on the extent of that control.  Although

ESI contends that prior document production is sufficient, the Court is not persuaded that documents alone obviate the need for Rule 30(b)(6) testimony explaining how these systems operated in practice and what authority ESI exercised.  While Plaintiff's response does not directly address Topic 5, the Court has considered Plaintiff's arguments regarding financial control and payroll operations as presented elsewhere in the briefing.  Given the discrete subject matter and defined timeframe, the Court finds that preparing a corporate representative to address Topic 5 does not impose a burden disproportionate to the needs of the case.  Accordingly, ESI's request for a protective order as to Topic 5 is **denied**.

### iii.   Human Resources Investigations (Topic 6(a)(vii))

Topic 6(a)(vii) seeks testimony regarding ESI's role in any HR investigations at the Riverbend facility for the Relevant Period.  Doc. 91, at 4-5.

ESI argues that the topic is overbroad because it is not limited to employees involved in the decedent's care or to issues related to the allegations in the complaint.  According to ESI, testimony about all HR investigations during the stated period is not relevant or proportional to the needs of the case.

Plaintiff argues that testimony concerning human resources investigations conducted at the facility is appropriately limited in scope and proportional to the needs of the case.  Plaintiff contends that if ESI conducted investigations relating to staffing adequacy, employee conduct, or safety issues during that period, such information may bear on the company's knowledge of conditions at the facility and its response to potential staffing or operational concerns prior to the decedent's stay.

The Court finds that Topic 6(a)(vii) seeks discovery that is relevant in part but overly broad as drafted.  The topic, as written, could encompass a wide range of employment matters unrelated to the underlying litigation.  However, investigations concerning staffing adequacy, employee conduct affecting resident care, or safety issues at the Riverbend facility during the Relevant Period may bear

on what corporate entities knew regarding operational conditions at the facility and how they responded to those concerns.  To ensure the discovery remains proportional to the needs of the case, the Court limits Topic 6(a)(vii) to human resources investigations during the relevant period that concern staffing levels, employee conduct affecting resident care, or resident safety issues.  Accordingly, ESI's request for a protective order as to Topic 6(a)(vii) is **granted in part**.

### iv.    Reports, Dashboards, and Analytics Provided to or Concerning the Facility (Topics 13(a)(i) and 22)

Topic 13(a)(i) seeks testimony regarding all data reports, dashboards, or analytics provided by ESI to Big Blue or Gateway regarding financial reports for the Relevant Period.  Topic 22 seeks testimony, for the Relevant Period, regarding the types of: (a) financial reports generated regarding facility performance sent to Gateway or Ensign Group regarding financial condition; (b) whether ESI recommended changes to related party fee structure; and (c) whether ESI continued charging fees under the above conditions and the impact of the facility's financial condition on services provided.  Doc. 91, at 10.

As to both Topics, ESI argues that phrase "financial reports" is overly broad and not stated with reasonable particularity, as the term could encompass a wide range of documents.  ESI further contends that detailed financial reporting is not relevant to the allegations in the complaint and that generalized undercapitalization allegations do not justify intrusive discovery into proprietary financial materials.  ESI further contents that Topic 22 is duplicative of Topic 13(a)(1), differing only in that it includes Ensign Group as an additional recipient.

Plaintiff responds that ESI is the entity responsible for providing IT and accounting services, which designed and maintained systems that tracked facility performance metrics and generated reports distributed within the corporate structure.  Plaintiff contends that testimony regarding what metrics were monitored, how those reports were generated, and how information regarding the

facility's financial condition and staffing was communicated to corporate leadership is relevant to understanding the scope of corporate oversight and the flow of information within the organization. Plaintiff argues that such reporting may demonstrate what aspects of facility operations corporate entities monitored and what information they received about the facility's financial condition, staffing levels, and operational performance during the relevant period.

The Court finds that Topics 13(a)(i) and 22 seek discovery relevant to Plaintiff's allegations that affiliated corporate entities exercised oversight and control over Big Blue's operations. The Court finds that the topics are not wholly duplicative; however, to the extent that any topics overlap, any duplication may be managed through the deposition itself rather than through a protective order. Given the allegations that ESI provided IT and accounting services that generated performance reports distributed within the corporate structure, testimony regarding the types of reports generated, the metrics tracked, and the manner in which financial and operational information was communicated to corporate leadership, may bear on the scope of corporate oversight and the flow of information regarding the Riverbend facility's condition. To ensure the discovery remains proportional to the needs of the case, the Court limits both topics to the reporting systems utilized, the metrics monitored, and the distribution of such reports, rather than a detailed recitation of every financial figure contained therein. Accordingly, ESI's request for a protective order as to Topics 13(a)(i) and 22 is **granted in part**.

### v. Accounts Receivable Management (Topic 15(a)(ii))

Topic 15(a)(ii) seeks testimony regarding ESI's involvement in accounts receivable management for the Riverbend facility for the Relevant Period. Doc. 91, at 7.

ESI argues that "accounts receivable management" is vague and not stated with reasonable particularity, leaving the scope of inquiry unclear and undefined. It further contends that the complaint contains no allegations concerning difficulties in collecting accounts receivable or related

46

financial issues.

Plaintiff responds that Topic 15(a)(ii) is relevant because ESI, as the entity providing accounting services to Big Blue, allegedly managed the Riverbend facility's accounts receivable collection process. Plaintiff contends that the way accounts receivable are collected and managed directly affects the facility's available cash flow and therefore its ability to fund operating expenses, including staffing. According to Plaintiff, testimony regarding ESI's role in accounts receivable management may demonstrate how cash moved through the corporate structure and whether centralized financial systems affected the resources available to the facility.

The Court finds that Topic 15(a)(ii) seeks discovery relevant to Plaintiff's allegations that affiliated corporate entities exercised centralized financial control over Big Blue's operations. The Court is not persuaded by ESI's argument that the topic is impermissibly vague. Accounts receivable management is a commonly understood accounting function, and the topic provides sufficient notice of the subject matter to permit preparation of a corporate representative. Plaintiff alleges that corporate entities controlled financial operations affecting the Riverbend facility's available resources. Testimony regarding whether ESI managed or participated in the Riverbend facility's accounts receivable processes may bear on how revenue was collected and how funds became available for the Riverbend facility's operations.

To be clear however, the scope of permissible inquiry is limited to ESI's role and involvement in accounts receivable management, i.e., the process, systems, and functions ESI performed in connection with the Riverbend facility's accounts received. It does not extend to the identity of individual debtors, specific amounts owed, or underlying details of accounts. The relevant inquiry is whether and how ESI participated in accounts receivable functions, not the substantive content of individual receivables. Accordingly, ESI's request for a protective order as to Topic 15(a)(ii) is **denied**.

47

### vi.    Board Meetings and Corporate Actions Affecting the Facility (Topic 17)

Topic 17 seeks testimony regarding all board meetings, resolutions, or corporate actions by ESI affecting Big Blue during the six-month period preceding decedent's last day at the facility, specifically: any resolutions regarding services to the Facility; any policy decisions affecting the Facility; any budget decisions affecting the Facility; and any other actions affecting the Facility's operations.  Doc. 91, at 8.

ESI argues that the six-month timeframe is overbroad and burdensome given the limited period at issue in this case.  It further contends that the phrases "policy decisions" and "any other actions affecting the Facility's operations" lack reasonable particularity and could encompass matters far beyond the allegations in the complaint.  According to ESI, the undefined scope of the topic renders its outer limits unclear and warrants protection.

Plaintiff responds that the six-month timeframe requested in Topic 17 is reasonable and proportional because it captures the corporate decision-making period preceding and surrounding the decedent's stay at the facility.  Plaintiff argues that board meetings, resolutions, and other corporate actions during that period may reflect policy decisions, budget approvals, or operational directives that governed staffing and facility operations.  Plaintiff contends that such information may help establish the scope of corporate oversight and decision-making authority affecting the facility.  Plaintiff further contends that courts have permitted discovery of similar corporate governance materials over comparable time periods where corporate control and operational decision-making are at issue.[11]

---

[11] The Court notes that Plaintiff cites *Murray v. ManorCare, Inc.*, 975 F. Supp. 2d 1002, 1012 (D. Kan. 2013), which does not appear to correspond to the authority discussed in the briefing.  The Court understands Plaintiff to be referring to *Murray v. ManorCare of Topeka KS, LLC*, No. 19-2148-DDC-KGG, 2020 WL 1819884 (D. Kan. Apr. 10, 2020).  Plaintiff cited that case correctly elsewhere in the briefing.  *See, e.g.*, Docs. 103 at 13, 25; 104 at 11, 15–16; 106 at 13; 107 at 12; 108 at 15. The Court also notes the same incorrect citation appears once in Doc. 104 at 16.  Given the volume of briefing submitted across six discovery

The Court finds that Topic 17 seeks discovery that is relevant in part but overly broad as drafted. Plaintiff alleges that corporate entities exercised oversight and control over staffing and operational decisions at the Riverbend facility. *See Murray*, 2020 WL 1819884, at *9–10 (allowing discovery into staffing budgets and financial oversight because such information could bear on whether corporate entities influenced staffing and operational decisions at the facility). Board meetings or corporate actions addressing staffing policies, budgeting decisions, or operational oversight during the relevant timeframe may bear on the scope of that corporate involvement.

The Court, however, agrees that the phrase "any other actions affecting the Facility's operations" is broader than necessary and lacks the reasonable particularity required to permit meaningful preparation of a corporate representative. Accordingly, the Court limits Topic 17 to board meetings, resolutions, or corporate actions during the six-month period that specifically concern staffing levels, budget allocations, or operational oversight of the Riverbend facility. The broader catchall language, "any other actions affecting the Facility's operations" and "policy decisions" without further qualification is overbroad.

Regarding the temporal scope, the Court notes that Topic 17 uses a six-month lookback period rather than the sixty-day period applied to other topics. The Court finds the longer appropriate here given that corporate governance decisions are typically made on a prospective basis and may precede operational effect by weeks or months. A sixty-day window could fail to capture decisions that were made that shaped conditions at facility during period of time at issue. Thus, the six-month period is proportional to the nature of discovery sought.

Accordingly, ESI's request for a protective order as to Topic 17 is **granted in part**. ESI shall designate a witness prepared to testify regarding board meetings, resolutions, or corporate

motions, the Court attributes the discrepancy to carelessness rather than any more concerning issue. The Court therefore takes no further action but cautions counsel to carefully review citations in future filings.

actions during the six-month period that relate to staffing policies, budget decisions, or corporate oversight of the Riverbend facility.

### vii.    Centralized Cash Management and Transfers (Topic 19)

Topic 19 seeks testimony, for the Relevant Period, regarding the following: whether Medicare and Medicaid accounts receivable of Big Blue are swept into lockbox accounts controlled by ESI; the mechanics of the cash sweep process; who authorized such transfers from the Facility; whether facility management could prevent or control such transfers; whether such transfers were documented as loans with repayment terms and interest; and how the Facility obtained funds for operating expenses after cash sweeps.  Doc. 91, at 9.

ESI argues that this request is duplicative of Topic 4 as directed to ESI and incorporates arguments previously raised concerning centralized cash management.  According to ESI, inquiry into these financial mechanisms is not relevant to the claims asserted and is not proportional to the needs of the case.

Plaintiff argues that testimony regarding the facility's cash management system is necessary because ESI—not Big Blue—designed and operated the centralized financial structure through which facility funds were managed.  Plaintiff contends that ESI established the lockbox and cash management arrangements, managed the revolving credit facility, calculated intercompany balances, and controlled the timing and amount of cash transfers between facilities and the corporate parent. Plaintiff further contends that because ESI created and administered these systems, discovery into their operation cannot be characterized as unduly burdensome or shielded merely on the grounds that the information may be commercially sensitive.

The Court finds that Topic 19 seeks discovery that is relevant but broader than necessary as drafted.  Testimony regarding the existence and operation of a centralized cash management system, including whether facility revenues were swept into corporate controlled accounts, who authorized

or controlled such transfers, and how the facility obtained operating funds thereafter, may bear on the degree of corporate oversight exercised over the facility's finances and its ability to fund operations, including staffing, during the Relevant Period.

Regarding ESI's objection that the Topic is duplicative, the Court has reviewed Topic 4 as directed to ESI. While Topic 4 addresses ESI's role in centralized cash management generally, Topic 19 seeks testimony directed to specific operational mechanics. These are distinct lines of inquiry that go beyond the general cash management framework addressed in Topic 4. To the extent any specific subpart of Topic 19 is subsumed within Topic 4, that overlap may be managed at the deposition itself and does not warrant a protective order as to the same.

The Court, however, agrees that certain subparts of Topic 19 extend beyond what is necessary. Inquiry into the full mechanics of the cash sweep process and intercompany loan documentation could extend into detailed corporate financial arrangements not sufficiently connected to the facility's operations. The Court therefore limits Topic 19 to testimony regarding whether Big Blue's Medicare and Medicaid receivables were swept into centralized or lockbox accounts controlled by ESI or affiliated entities, who authorized or controlled those transfers, whether facility management could prevent or control the transfers, and how the facility obtained funds for operating expenses after such transfers during the Relevant Period. Accordingly, ESI's request for a protective order as to Topic 9 is **granted in part**.

### viii. Capital Contributions and Negative Fund Balances (Topic 24)

Topic 24 seeks testimony regarding the negative difference between the Facility's General Fund Balance as of December 31, 2022 (Worksheet G, Line 52), and December 31, 2023 (Worksheet G, Line 52), specifically: does ESI agree that the General Fund Balance declined between these periods and if not, explain; if ESI agrees, whether capital contributions were made or requested from other defendants during the year 2023; and how the facility continued to operate

despite the negative fund balance.  Doc. 91, at 11.

As noted earlier, the parties frequently rely on incorporation by reference and do not always present arguments on a topic-by-topic basis.  Given the overlap in issues and the volume of briefing, the Court has reviewed the briefing as a whole and considers arguments raised elsewhere as necessary to capture each party's position.

ESI argues that this topic is duplicative of Topic 18 directed to Big Blue and incorporates those arguments by reference.  It further contends that the complaint contains no specific allegations concerning capital contributions or fund balances, and that the burden and intrusiveness of this financial inquiry outweighs any potential benefit.  Plaintiff response doesn't address the substance of the information sought in this topic, therefore, as done earlier, the Court will consider Plaintiff's arguments raised elsewhere in the briefing.

The Court concludes that Topic 24 seeks relevant and proportional discovery.  Plaintiff alleges that corporate entities exercised financial oversight and control over the Riverbend facility in a manner that affected its available operating resources and staffing levels.  Testimony regarding changes in the facility's General Fund Balance, the existence of any capital contributions, and how the facility continued to operate despite a negative balance may bear directly on those allegations by providing insight into the facility's financial condition and the role of corporate entities in addressing it.

The Court is not persuaded that the topic is impermissibly duplicative of discovery directed to Big Blue, as ESI may possess distinct knowledge regarding financial decisions and corporate-level responses.  Although ESI argues the topic is not relevant and unduly burdensome, those objections are not sufficiently substantiated.  While Plaintiff does not directly address this topic, the Court has considered Plaintiff's broader arguments regarding corporate financial control as presented elsewhere in the briefing.  Given the discrete subject matter and defined timeframe, the Court finds

that preparing a corporate representative to address these issues does not impose a burden disproportionate to the needs of the case.  Accordingly, ESI's request for a protective order as to Topic 24 is **denied**.

### ix.  Medicare/Medicaid Payment Transfers and Intercompany Loans (Topic 25)

Topic 25 seeks testimony regarding the Riverbend facility's negative 'Other Current Assets' as of December 31, 2022 (Worksheet G, Line 9), and $(1,331,325) as of December 31, 2023 (Worksheet G, Line 9), specifically: whether the figures are accurate; and, if so, how the Facility arrived at a negative Other Current Assets balance; whether this balance represents amounts transferred to related entities as defined by the Centers for Medicare and Medicaid Services through lockbox accounts, sweep accounts, or intercompany loans; terms of any intercompany loans involving the Facility including interest rates and repayment terms; how cash was transferred from the Facility while it was operating at a loss with a negative fund balance; who authorized these transfers from the Facility; and whether facility management had authority to prevent or control these transfers.  Doc. 91, at 11.

ESI argues that this request is duplicative of Topic 2(iii) directed to Big Blue and incorporates Big Blue's arguments concerning guarantees and financial commitments by reference. ESI further contends that generalized allegations of undercapitalization do not justify intrusive discovery into confidential and proprietary banking and transfer information.

Plaintiff responds that Topic 25 seeks relevant information regarding intercompany loans and related financial arrangements that allegedly governed how cash moved between Big Blue and affiliated corporate entities.  Plaintiff contends that testimony regarding the terms, authorization, and repayment of such loans may show how financial obligations imposed by the corporate structure affected the facility's available resources and operational decisions.  Plaintiff further contends that

53

ESI, as the entity responsible for accounting services and financial management functions, would have knowledge of how these loan arrangements were structured and administered, making its testimony necessary to explain how those financial systems operated and affected the facility's finances.

The Court finds that Topic 25 seeks discovery that is relevant and not duplicative of Topic 2(iii). *See Martley*, 2021 WL 4134307, at *2–3 (finding that Rule 30(b)(6) testimony is not unreasonably cumulative merely because it addresses subjects covered in prior written discovery and deposition testimony); *see also Foreclosure Mgmt. Co.*, 2008 WL 3895474, at *5 ("[I]t is a generally accepted practice for litigants to engage in successive forms of discovery such as the production of documents and depositions"). Big Blue and ESI occupy different roles within the alleged corporate structure. ESI is identified as the entity providing accounting and financial management services to the facility, and as such may possess distinct knowledge regarding how intercompany loans or financial transfers were structured and administered, knowledge that Big Blue, may not independently possess.

Plaintiff alleges that corporate entities exercised centralized control over the Riverbend facility's finances and that mechanisms such as intercompany loans and cash management systems affected the resources available for staffing and operations. A negative Other Current Assets balance of nearly $1 million as of the end of 2023, during a period in which the facility was allegedly operating at a loss, may provide insight as to the effects of centralized financial control. Testimony regarding the existence, authorization, and administration of such financial arrangements may bear on those allegations. ESI has not demonstrated good cause that preparing a witness to address this topic would impose an undue burden or expense disproportionate to the needs of the case. Accordingly, ESI's request for a protective order as to Topic 25 is **denied**.

<blockquote><strong>x. CMS Cost Reports and "Chain Organization" Designation (Topics 27</strong></blockquote>

**and 28)**

Topic 27 seeks testimony regarding The Ensign Group, Inc.'s identification as the chain organization (Chain Number HB1576) on Big Blue's CMS 2540 cost report, for the Relevant Period, specifically: the meaning of this chain designation under CMS regulations; what relationship this designation reflects; any home office services provided through the chain organization; and any regulatory or reporting obligations arising from this chain designation. Doc. 91, at 12.

Topic 28 seeks testimony regarding the Riverbend Facility's 2540 Medicare cost reports for 2022 and 2023 which identify Ensign Group as the "chain organization" with Chain Number HB1576 (Worksheet S-2, Part I, Lines 44–47)[12] specifically: Is the reporting in the 2022 and 2023 cost reports referenced above accurate?; and if so, describe what the "chain organization" designation under Centers for Medicare and Medicaid Services' regulations indicates about Ensign Group's relationship to the Facility; obligations arising from chain organization designation; whether Ensign Group completes CMS Form 287 (Home Office Cost Report) for its chain of facilities; what Ensign Group's understanding is of the meaning of "controlled" for purposes of chain designation; and how many facilities are included in Chain #HB1576. *Id.*

As to Topic 27, ESI argues that the complaint contains no allegations concerning regulatory or reporting obligations, and that inquiry into such matters is not relevant or proportional to the wound-care allegations at issue. ESI also notes that similar topics have been directed to other Defendants and argues that the request is duplicative and cumulative. As to Topic 28, ESI argues that the topic is duplicative of Topic 27 and overlaps with requests directed to The Ensign Group, Inc. ESI further contends that the wording of the topic creates confusion by inquiring of ESI about *The Ensign Group's* understanding of certain terms.

---

[12] The home office address is listed as 29222 Rancho Viejo Rd Suite 127, San Juan Capistrano, CA 92675.

Plaintiff responds that testimony regarding The Ensign Group's identification as the chain organization on Big Blue's CMS cost reports is relevant because those reports expressly designate The Ensign Group as Chain Number HB1576 and identify related entities within the corporate structure.  Plaintiff contends that ESI, as the accounting and administrative services provider, participated in preparing and submitting these reports and therefore possesses knowledge regarding the meaning and implications of the chain organization designation under CMS regulations.  Plaintiff further contends that the term "chain organization" is defined in CMS guidance and reflected in the cost report filings prepared by ESI, and that testimony regarding the reporting requirements, the relationships reflected in those filings, and the services provided through the chain organization structure is relevant to understanding the scope of corporate oversight of the Riverbend facility.

The Court agrees, however, that the topics as drafted are broader than necessary in two respects.  First, to the extent that Topics 27 and 28 seek testimony requiring ESI to interpret CMS regulations and offer legal conclusions regarding regulatory obligations under federal law, the request exceeds the proper scope of Rule 30(b)(6) testimony.  *See Sprint Comm'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528–29 (D. Kan. 2006) (explaining that a Rule 30(b)(6) witness testifies regarding the corporation's knowledge of facts reasonably available to the organization and does not provide personal opinions); *Nazario v. Univ. of Kansas Hosp. Auth.*, No. 24-2448-TC-TJJ, 2026 WL 411823, at *8 (D. Kan. Feb. 13, 2026) (distinguishing between testimony regarding underlying facts bearing on legal issues and questions calling for legal conclusions).  Second, Topic 28's inquiry into Ensign Group's subjective understanding of the term "controlled" for purposes of the chain designation is more appropriately directed to Ensign Group rather than to ESI, and ESI cannot be reasonably expected to speak to another entity's regulatory understanding.

Accordingly, the Court limits Topics 27 and 28 to testimony regarding the preparation and submission of the cost reports, the contents of the reports including entities identified in the chain

designation, and the corporate relationships reflected in the filings.  ESI's request for a protective

order as to Topics 27 and 28 is **granted in part**.

**It is therefore ordered that ESI's motion for protective order (Doc. 102) is granted in
part and denied in part as set forth above.**

### d.  Ensign Group, Inc.'s Motion for Protective Order

The Court next addresses The Ensign Group, Inc. ("TEG"), the publicly traded parent

corporation of ESI, that allegedly exercised control over the decedent's care at the Riverbend

Facility.  TEG challenges Topics 4, 5, 6, 7, 12, 13, 14, 16, and 17 in Plaintiff's Third Amended Rule

30(b)(6) Notice (Doc. 94).  The disputed topics concern capitalization policies, financing

arrangements, centralized cash management, real estate relationships, and CMS cost report

designations.  Because Plaintiff asserts an alter-ego theory against TEG, several of these topics

implicate corporate control and financial structure.  The Court addresses each below.

### i.  Authority Over Hiring, Evaluation, and Termination of Senior Leadership (Topic 4)

Topic 4 seeks testimony, during the Relevant Period, regarding TEG's role in hiring,

evaluating, or terminating senior leadership at Gateway or Big Blue, specifically: the authority of the

CEO of TEG, or other TEG officer, director, board member, or employee to hire, appoint, or

terminate officers or administrators at affiliated entities within the chain organization including the

Facility; any authority of TEG's Board of Directors and/or officers over personnel decisions at

affiliated entities within the chain organization including the Facility; and the process by which

administrators are hired and terminated at affiliated entities within the chain organization including

the Facility.  Doc. 94, at 3.

TEG argues that although the topic initially references specific entities, subsequent subparts

expand the scope to "affiliated entities," rendering the request overbroad.  TEG contends that

discovery should be limited to the named Defendants and that inquiry into personnel authority over other facilities not involved in the decedent's care is not relevant to the claims asserted.

Plaintiff responds that testimony regarding TEG's role in hiring, evaluating, or terminating senior leadership at Gateway Healthcare and Big Blue is relevant to the complaint's allegations that corporate entities exercised control over staffing and facility operations. Plaintiff argues that authority over hiring and termination decisions is a key indicator of corporate control and may demonstrate whether TEG influenced or directed staffing decisions affecting resident care. Plaintiff further points to prior testimony indicating that TEG possessed authority to hire or fire administrators and directors of nursing at affiliated facilities, which Plaintiff contends supports inquiry into the scope of that authority.

The Court agrees with TEG. Authority to hire, evaluate, or terminate facility leadership may bear on Plaintiff's allegations that corporate entities exercised oversight and control over the operations of Big Blue and Gateway, and testimony regarding TEG's authority over leadership positions at those entities is therefore relevant. However, the phrase "affiliated entities" expands the scope of the topic beyond the entities involved in this litigation and could encompass facilities or corporate relationships unrelated to the claims asserted. Accordingly, Topic 4 is limited to testimony concerning TEG's authority to hire, evaluate, or terminate leadership at Gateway and Big Blue and the process by which administrators at those entities are hired or terminated. Because TEG's objection is directed solely to the inclusion of "affiliated entities," the Court adopts that limitation and therefore **grants** TEG's request for a protective order as to Topic 4. TEG shall produce a Rule 30(b)(6) witness prepared to testify on Topic 4 as so limited to Gateway Healthcare and Big Blue.

### ii. Capital Expenditures and Source of Capital (Topic 5)

Topic 5 seeks testimony regarding TEG's involvement in capital allocation decisions for Big Blue, for the Relevant Period, specifically: how capital is allocated to Big Blue; any capital investment

decisions affecting Big Blue; any approval required from TEG for capital expenditures at the Facility; and the source of capital for affiliated facilities.  Doc. 94, at 4.

TEG seeks to limit Topic 5, noting that subsection 5(iv) references "affiliated facilities" and, in TEG's view, should be narrowed to Big Blue only.  TEG further argues that Topic 5 lacks reasonable particularity because the terms "capital expenditure" and "source of capital" are undefined and could encompass a broad range of financial information.

Plaintiff argues that testimony regarding TEG's authority over capital expenditures and funding sources for facility operations is relevant to understanding the extent of corporate oversight and financial control over Big Blue and related entities.  Plaintiff contends that capital expenditure decisions may affect the resources available for facility operations, including staffing and patient care.  Plaintiff also maintains that references to "affiliated entities" reflect the operational structure of the organization, in which facilities were allegedly managed through cluster-based oversight and shared financial and operational decision-making.

The Court finds that testimony concerning capital expenditures and funding sources for Big Blue may bear on Plaintiff's allegations that corporate entities exercised financial control over the facility's operations and resources.  The Court is not persuaded by TEG's argument that the terms "capital expenditure" and "source of capital" are impermissibly vague.  These terms carry their ordinary financial meaning and, in the context of the topic, are sufficiently particular to permit TEG to prepare a corporate representative.  However, the reference to "affiliated facilities" expands the topic beyond the entities involved in this litigation and is therefore broader than necessary.  The Court limits Topic 5 to capital expenditures and sources of capital relating to Big Blue.  TEG's request for a protective order as to Topic 5 is **granted in part**.

### iii.  Revolving Credit Facility and Financing Arrangements (Topic 6)

Topic 6 seeks testimony regarding any revolving credit facility or other financing

arrangements in effect during the Relevant Period in which Big Blue or Gateway participated, specifically: whether TEG serves as guarantor; whether Big Blue, Gateway, or any affiliated entity is a borrower, co-borrower, or loan party; whether the Facility's accounts receivable are pledged as collateral; any approval required under the credit agreement before the Facility can take certain actions; and whether census or any other metric regarding the operation of Big Blue is a condition of the revolving credit facility or other financing arrangements.  Doc. 94, at 4.

TEG argues that the topic is substantially similar to Topic 2(iii) directed to Big Blue concerning guaranties and financial commitments and incorporates those arguments by reference. According to TEG, the complaint contains no specific allegations concerning credit facilities or lending practices, and the generalized undercapitalization allegations do not justify discovery into financing arrangements.  TEG contends that inquiry into such lending or credit matters is not relevant to the allegations in the complaint and is not proportional to the needs of the case.

Plaintiff responds that testimony regarding revolving credit or other financing arrangements involving Big Blue or Gateway is relevant to the complaint's allegations that corporate entities exercised centralized control over financial management and resource allocation.  Plaintiff argues that such arrangements may reveal how facility funds were accessed or distributed and whether corporate-level decisions affected the facility's ability to fund operations, including staffing.  Plaintiff further contends that testimony from TEG is necessary to explain the corporate authorization and structure of these financing mechanisms.

The Court is not persuaded that the topic is improper.  Financing arrangements—such as revolving credit facilities—may bear on how operating capital was obtained, who controlled access to those funds, and whether corporate-level financial decisions affected the resources available for facility operations.  Testimony concerning the existence and structure of such arrangements and TEG's role in authorizing or administering them may therefore be relevant to Plaintiff's theory of

corporate control.  However, to the extent the topic seeks testimony regarding financing arrangements involving "affiliated entities," the Court finds that aspect of the topic to be broader than necessary, as it could encompass entities and transactions unrelated to the claims at issue. Consistent with the Court's prior rulings, the topic is limited to financing arrangements involving Big Blue and, where applicable, Gateway.

The Court also rejects TEG's duplication argument.  Big Blue may testify regarding its own financial obligations or borrowing arrangements, but TEG may possess distinct knowledge concerning the corporate-level financing mechanisms and approvals governing those arrangements. Discovery is not cumulative where different entities have different roles within the alleged corporate structure.  *See Sprint Commc'ns Co., L.P.*, 236 F.R.D. at 528–29 (explaining that a Rule 30(b)(6) witness presents the corporation's position and must testify regarding information known or reasonably available to that entity); *Monroe v. Monsanto Co.*, 531 F. Supp. 426, 432–34  (D.S.C. 1982) (recognizing that affiliated corporations may maintain separate identities and functions despite a common parent).  Finally, TEG has not demonstrated that preparing a corporate representative to address financing arrangements involving Big Blue or Gateway during the relevant timeframe would impose an undue burden or is disproportionate to the needs of the case.  TEG's request for a protective order as to Topic 6 is therefore **denied**.

### iv.  Capitalization Policies and Adequacy Assessments (Topic 7)

Topic 7 seeks testimony regarding TEG's policies, formal or informal, regarding capitalization of subsidiary operating companies and the adequacy of capital to meet resident care needs, for the Relevant Period, specifically: minimum capitalization requirements; how capitalization adequacy is assessed; any policies for providing additional capital to Big Blue; and any metrics for assessing the need for capital at Big Blue.  Doc. 94, at 5.

TEG argues that the topic is overbroad because it references "subsidiary operating

companies," which could encompass entities beyond those named as defendants in this action. TEG further contends that the complaint contains no specific allegations concerning capitalization policies or misuse of accounting practices, and that inquiry into such policies is not relevant to the wound-care allegations asserted. TEG states the request exceeds the bounds of proportional discovery and intrudes into confidential financial policies, warranting protection.

Plaintiff responds that testimony regarding TEG's policies for capitalizing subsidiary facilities and assessing whether they had adequate financial resources to meet resident care needs is directly relevant to the complaint's allegations that corporate decisions left Big Blue undercapitalized and unable to maintain adequate staffing. Plaintiff contends that the topic concerns corporate policies and decision-making regarding capital allocation, not accounting conventions, and may reveal whether TEG had procedures for evaluating financial distress at subsidiary facilities or providing additional capital when needed. Plaintiff asserts such testimony may bear on whether corporate-level financial decisions affected the resources available for staffing and patient care at the facility.

The Court finds the topic is relevant in part but overly broad as drafted. Plaintiff alleges that the corporate Defendants exercised centralized control over the Riverbend facility's financial resources and that corporate decisions left Big Blue undercapitalized and unable to maintain adequate staffing. Corporate policies governing how affiliated facilities are capitalized, or how their financial adequacy is evaluated, may bear on whether corporate decision-making affected the resources available for facility operations. To the extent Defendants contend the requested testimony implicates confidential or proprietary financial information, those concerns may be adequately addressed through the existing protective order governing confidential materials in this case.

However, the reference to "subsidiary operating companies" expands the scope beyond the

entities involved in this litigation and could encompass facilities unrelated to the claims at issue. Discovery into capitalization policies applicable to the entire corporate network is broader than necessary to explore Plaintiff's theory of corporate control over Big Blue.  Accordingly, Topic 7 is limited to testimony concerning TEG's policies for assessing the capitalization or financial adequacy of Big Blue and, to the extent relevant, Gateway during the relevant period.  Subject to this limitation, the requested testimony falls within the scope of permissible discovery.  TEG's request for a protective order as to Topic 7 is therefore **granted in part**.

### v.    Centralized Cash Management and Sweep Accounts (Topic 12)

Topic 12 seeks testimony regarding TEG's role in centralized cash management, for the Relevant Period, specifically: any lockbox accounts or sweep accounts; any centralized treasury functions; how funds flow among affiliated entities including Big Blue; TEG's access to or control over funds of the Facility; and any inter-company loans or transfers regarding Big Blue. Doc. 94, at 6-7.

TEG argues that this topic is substantially similar to Topic 11 directed to Big Blue and is therefore duplicative and cumulative.  TEG incorporates by reference Big Blue's arguments that such inquiries seek proprietary financial information that is neither relevant nor proportional to the claims asserted.

Plaintiff argues that testimony regarding centralized cash management systems, including sweep or lockbox accounts, is not duplicative of testimony sought from Big Blue because the topics concern different levels of corporate knowledge.  Plaintiff contends that Big Blue may testify about the facility's experience with these systems, while TEG can explain the corporate policies, authorization structures, and decision-making processes governing cash transfers.  Plaintiff argues such testimony may demonstrate how corporate financial controls operated and how those controls affected the facility's financial resources and operations.

The Court disagrees with TEG.  Although both topics concern centralized cash management systems, the entities occupy different roles within the alleged corporate structure.  Big Blue may testify regarding the Riverbend facility's participation in any such systems, but TEG may possess distinct knowledge concerning the policies, authorization structures, and decision-making processes governing those systems at the corporate level.  Discovery is not cumulative merely because different entities are asked to testify about related aspects of the same corporate system.

The Court further concludes that testimony regarding centralized cash management mechanisms is relevant to Plaintiff's allegations that corporate entities exercised financial control over the Riverbend facility's operations and resources.  Systems that automatically sweep funds, control disbursements, or centralize revenue collection may affect the Riverbend facility's access to operating capital and therefore bear on the extent of corporate oversight alleged in the complaint. TEG's general assertions that the topic implicates proprietary financial information are insufficient to demonstrate that the discovery sought is disproportionate to the needs of the case, and any confidentiality concerns may be addressed through the existing protective order.  However, to the extent the topic seeks testimony regarding financing arrangements involving "affiliated entities," the Court finds that aspect of the topic to be broader than necessary, as it could encompass entities and transactions unrelated to the claims at issue.  Consistent with the Court's prior rulings, the topic is limited to financing arrangements involving Big Blue and, where applicable, Gateway.  Accordingly, TEG's request for a protective order as to Topic 12 is **granted in part**.

### vi.   Authority to Bind or Obligate Big Blue Healthcare, LLC (Topic 13)

Topic 13 seeks testimony regarding TEG's authority to enter into agreements that bind or obligate Big Blue, for the Relevant Period, specifically: the authority to enter into lease agreements, loan agreements, or contracts on behalf of Big Blue; the authority to guarantee leases or loans for Big Blue; the individuals authorized to bind TEG; and any guaranties provided for the benefit of Big

64

Blue, Gateway, or ESI.  Doc. 94, at 7.

TEG argues that the complaint contains no allegations concerning such agreements or financing arrangements and that inquiry into these matters exceeds the scope of the pleaded claims. TEG contends that discovery into contractual authority and guaranties would intrude into proprietary corporate information without a demonstrated connection to the wound-care allegations at issue.

Plaintiff responds that testimony regarding TEG's authority to enter into agreements binding Big Blue—including leases, loans, contracts, or guaranties—is relevant to determining the scope of corporate control over the Riverbend facility's operations.  Plaintiff argues that such agreements may affect the facility's financial obligations and operational capacity and therefore bear on the resources available for staffing and resident care.  Plaintiff contends that evidence regarding the corporate authority to enter into binding agreements may help establish the extent to which TEG exercised control over the facility.

The Court finds that authority to bind Big Blue to financial obligations—such as leases, loans, or contractual commitments—may bear on the degree of financial control exercised by TEG and the obligations imposed on the Riverbend facility.  Testimony concerning such authority is relevant to understanding how corporate decisions affect the facility's financial resources and operations.

However, several aspects of the topic extend beyond what is necessary to explore those issues.  In particular, the request for testimony concerning individuals authorized to bind TEG generally, and guaranties involving entities other than Big Blue or Gateway, would require inquiry into corporate governance matters unrelated to the facility at issue, and discovery of that breadth not proportional to the needs of the case.  Accordingly, Topic 13 is limited to testimony concerning TEG's authority to enter into agreements or guaranties binding or benefiting Big Blue, ESI, and

Gateway during the relevant period.  Subject to this limitation, the topic falls within the scope of permissible discovery.  TEG's request for a protective order as to Topic 13 is therefore **granted in part**.

### vii.   Real Estate Arrangements and Lease Relationships (Topic 14)

Topic 14 seeks testimony regarding TEG's involvement in real estate arrangements for the Facility, for the Relevant Period, specifically: any lease guaranties provided by TEG; any real estate holding companies affiliated with TEG and Big Blue; the relationship between TEG, Little Blue Health Holdings LLC and Big Blue; and any authority TEG exercises over real estate decisions involving Big Blue.  Doc. 94, at 7.

TEG argues that the complaint contains no allegations relating to real estate, leases, or property ownership and that such matters bear no relevance to the claims asserted.  TEG contends that broad inquiry into real estate arrangements is not proportional to a case involving alleged deficiencies in care during a brief period of residency.

Plaintiff responds that testimony regarding TEG's involvement in real estate arrangements for the facility is relevant because lease terms and property-related decisions may influence operating costs and the facility's financial resources.  Plaintiff argues that corporate authority over leases or property arrangements may reflect the level of control exercised by TEG over the facility's operations and infrastructure, which Plaintiff contends is relevant to the broader allegations of corporate oversight and decision-making affecting staffing and care.

The Court concludes that this topic falls outside the scope of proportional discovery. Plaintiff's claims focus on alleged deficiencies in care and staffing at the facility and on whether corporate entities exercised control over the Riverbend facility's operations and financial resources.[13]

---

[13] The Court notes that Topic 14 references "Little Blue Health Holdings LLC," an entity not otherwise discussed in the parties' briefing or clearly tied to the allegations in the Complaint.  Because the Court grants a

Although Plaintiff argues that lease terms or property arrangements may affect operating costs, the connection between real estate ownership structures and the staffing and care issues alleged in the complaint is too attenuated to justify the discovery sought. Inquiry into property relationships or lease arrangements would require a corporate representative to prepare testimony concerning real estate transactions that are several steps removed from the operational decisions at issue in this case. This imposes a burden disproportionate to the marginal relevance of the information sought. TEG's request for a protective order as to Topic 14 is **granted**.

### viii.   CMS Cost Reports and "Chain Organization" Designation (Topic 16)

Topic 16 seeks testimony regarding the Facility's 2540 Medicare cost reports for 2022 and 2023 which identify TEG as the "chain organization" with Chain Number HB1576 (Worksheet S-2, Part I, Lines 44–47),[14] specifically: is the reporting in the 2022 and 2023 cost reports accurate, and, if so, describe what the "chain organization" designation under Centers for Medicare and Medicaid Services' regulations indicates about TEG's relationship to the Facility; obligations arising from chain organization designation; whether TEG completes CMS Form 287 (Home Office Cost Report) for its chain of facilities; what TEG's understanding is of the meaning of "controlled" for purposes of chain designation; and how many facilities are included in Chain #HB1576. Doc. 94, at 9.

TEG advances arguments similar to those made by its co-Defendants, contending that the terms "chain organization" and "controlled" are undefined in the notice and lack reasonable particularity under Rule 30(b)(6), leaving unclear whether Plaintiff seeks TEG's interpretation, CMS's interpretation, or some other standard. TEG further argues that inquiry into the number of

---

protective order as to this topic on proportionality grounds, it does not address the role or relevance of that entity.

[14] The home office address is listed as 29222 Rancho Viejo Rd Suite 127, San Juan Capistrano, CA 92675.

facilities included in the chain is overbroad, as this case concerns only one facility.

Plaintiff responds that testimony regarding the CMS cost reports and the "chain organization" designation is relevant to the complaint's allegations that TEG exercised centralized control over the facility. Plaintiff argues that the cost reports identify TEG as the chain home office responsible for central management and administrative services and that the term "chain organization" is defined in CMS regulations, making it sufficiently particular.

The Court finds that testimony explaining the entities identified in the cost reports and the corporate functions reflected in those filings may bear on Plaintiff's theory of corporate control. However, the topic also seeks testimony regarding TEG's understanding of regulatory terms such as "chain organization" and "controlled." To the extent those subparts call for legal interpretation of federal regulatory terminology or speculation about how CMS defines such terms, they exceed the proper scope of Rule 30(b)(6) testimony. *See Sprint Commc'ns Co., L.P.*, 236 F.R.D. at 528–29 (explaining that a Rule 30(b)(6) witness testifies regarding the corporation's knowledge of facts reasonably available to the organization and does not provide personal opinions); *Nazario*, 2026 WL 411823, at *8 (distinguishing between testimony regarding underlying facts bearing on legal issues and questions calling for legal conclusions).

The Court further finds that inquiry into the number of facilities included within the identified chain is broader than necessary and disproportionate to the needs of this case, which concerns a single facility. Accordingly, Topic 16 is limited to testimony concerning the preparation and contents of the CMS cost reports, the entities identified in those reports, and the corporate relationships or administrative functions reflected in those filings as they relate to Big Blue. Subject to this limitation, the topic seeks information within the scope of permissible discovery. TEG's request for a protective order as to Topic 16 is **granted in part**.

### ix.    Medicare Cost Reports For 2022 And 2023 (Topic 17)

68

Topic 17 seeks testimony regarding the Riverbend facility's 2540 Medicare cost reports for 2022 and 2023 which identify TEG as the "chain organization" and report consecutive net operating losses in 2022 and 2023 (Worksheet G-3, Line 31), specifically: whether the 2022 and 2023 cost reports are accurate, and, if so, describe how facility operating losses and fund balance were reported to TEG; whether these metrics appeared in board materials or investor presentations; disclosures in SEC 10-K or 10-Q filings regarding subsidiary financial condition; actions TEG took in response to facility financial deterioration; and capital contributions made or considered.  Doc. 94, at 9.

TEG argues that the two-year timeframe is overbroad given the limited period of the decedent's stay and that the topic intrudes into broad corporate and public-company financial matters.  TEG further contends that the complaint contains no allegations concerning SEC disclosures, investor communications, or improper financial reporting, and that generalized undercapitalization allegations do not justify such expansive inquiry.

Plaintiff responds that testimony regarding Big Blue's operating losses in 2022 and 2023 and any related reports, board materials, SEC disclosures, and corporate responses is relevant to establishing systemic corporate oversight and knowledge of the facility's deteriorating financial condition.  Plaintiff argues that a multi-year timeframe is necessary to demonstrate patterns of financial decline and staffing reductions that cannot be captured in a short snapshot surrounding the decedent's stay.  Plaintiff contends that evidence showing whether TEG monitored the Riverbend facility's financial situation and what actions it took—or failed to take—in response bears directly on the allegations of corporate control, knowledge of operational deficiencies, and the broader claim of systemic negligence.

The Court concludes that the topic seeks relevant information in part but is overly broad as drafted.  Testimony regarding the Riverbend facility's reported operating losses, the manner in which those losses were communicated to TEG, and any corporate actions taken in response may

bear on whether corporate leadership monitored the facility's financial condition and how it responded to financial deterioration. Testimony concerning the financial information reflected in the CMS cost reports and corporate responses to the Riverbend facility's financial condition falls within the scope of permissible discovery.

However, the topic also seeks testimony regarding investor communications, board materials, and disclosures in SEC Forms 10-K and 10-Q. The complaint does not assert claims relating to securities disclosures or investor reporting, and inquiry into public-company disclosure practices would extend discovery into corporate governance and investor relations matters that are only tangentially connected to the issues in this case. Requiring a corporate representative to prepare testimony on such matters would impose a burden disproportionate to the needs of the case.

The Court also agrees that the two-year timeframe, as drafted, is broader than necessary. The Court limits the topic to the year 2023, which provides sufficient context to evaluate the facility's financial condition without imposing undue burden.

Accordingly, Topic 17 is limited to testimony concerning the financial condition of Big Blue as reflected in the 2023 CMS cost report, the reporting of that financial condition within the corporate structure, and any actions taken by TEG in response to the facility's financial performance. Subject to these limitations, TEG's request for a protective order as to Topic 17 is **granted in part**.

**It is therefore ordered that TEG's motion for protective order (Doc. 101) is granted in part and denied in part as set forth above.**

### e. Ignite Medical Resort Rainbow Boulevard, LLC's Motion for Protective Order[15]

---

[15] The Court notes that multiple Rule 30(b)(6) topics directed to the Ignite Defendants reference "the time period of the sixty days prior to Resident's stay at the Facility through the duration of her stay." As discussed

The Court next addresses Ignite Medical Resort Rainbow Boulevard, LLC ("Ignite Medical"). The decedent was admitted to Ignite Medical, a skilled nursing facility, on August 29, 2023. She remained there until September 7, 2023, when she was transferred to KU. Ignite Medical challenges certain topics in Plaintiff's Third Amended Rule 30(b)(6) Notice (Doc. 95), which concern staffing oversight, financial performance, corporate relationships, and operational decision-making during the Relevant Period. The specific topics at issue are Topic Nos. 4, 14, 16, 17, and 18. The Court addresses each disputed topic below.

### i. HPPD Targets and Staffing Performance Metrics (Topic 4)

Topic 4 seeks testimony regarding the exact HPPD (hours per patient day) target or range the Facility was required or expected to maintain, during the Relevant Period, specifically: who established this target; and; how actual HPPD compared to the target during Resident's stay. Doc. 95, at 3.

Ignite Medical contends that the topic extends beyond the proper scope of a Rule 30(b)(6) deposition and would require preparation of a corporate representative to testify regarding detailed hours-per-patient-day metrics established by Ignite Medical. According to Ignite Medical, such testimony would require highly particularized operational knowledge more appropriately addressed by a fact witness, such as the Director of Nursing, rather than a corporate representative.

Plaintiff responds that Ignite Medical's objection misunderstands the role of a Rule 30(b)(6) corporate representative and that the requested testimony is central to Plaintiff's theory that the facility was inadequately staffed in a manner that contributed to the decedent's deterioration during

---

above, the decedent's residency at the Ignite facility occurred after her discharge from Riverbend and is reflected in the record as August 29, 2023, through September 7, 2023. *See, e.g.*, Doc. 97, at 1. For purposes of this Order, the Court construes this phrase, as applied to the Ignite Defendants, to mean the sixty-day period preceding August 29, 2023—i.e., June 30, 2023—through September 7, 2023. Unless otherwise noted, this period of time will be referenced as the "Relevant Period" with respect to the Ignite Defendants.

her stay.  Plaintiff contends that Topic 4 seeks testimony regarding Ignite Medical's hours-per-patient-per-day (HPPD) staffing targets or benchmarks—matters that concern the facility's institutional knowledge, policies, and decision-making rather than the observations of an individual fact witness.  Plaintiff argues that while a director of nursing may testify regarding day-to-day staffing implementation, a corporate representative must testify regarding why particular staffing targets existed, how those targets were established, and whether they were influenced or constrained by corporate policies or directives.

Plaintiff further asserts that the record contains evidence supporting these allegations, including the Ignite Facility Assessment, signed by the CEO of Ignite Team Partners, which identifies specific staffing-hour targets based on projected census levels, and internal communications indicating that corporate personnel were involved in recruiting staff for the facility. According to Plaintiff, these materials demonstrate that staffing levels were not determined solely at the facility level, but were instead shaped by corporate-level policies and oversight, and therefore support the need for Rule 30(b)(6) testimony regarding how HPPD targets were established and implemented during the relevant period.

Plaintiff also points to financial information reflected in the Facility's CMS cost reports, which Plaintiff contends further demonstrates that Ignite Medical's operations were influenced or constrained by corporate-level financial decisions, such as those from Ignite Team.  Specifically, Plaintiff notes that the Ignite facility reported paying substantial management fees to its corporate parent—approximately $624,800 in 2022 and $605,000 in 2023—while CMS disallowed significant portions of those amounts as excessive or unallowable—approximately $250,715 in 2022 and $252,609 in 2023.  Plaintiff argues that these figures support its allegation that corporate financial arrangements affected the resources available to the Ignite facility and, in turn, its ability to maintain adequate staffing levels.

The Court disagrees with Ignite Medical.  Rule 30(b)(6) requires a corporate entity to designate a representative prepared to testify regarding matters known or reasonably available to the organization, including the entity's policies, decision-making processes, and institutional knowledge. In this case, staffing benchmarks such as HPPD targets fall within that category.  Although individual employees may possess personal knowledge regarding day-to-day staffing decisions, the purpose of a Rule 30(b)(6) deposition is to obtain testimony regarding the entity's understanding of its own policies and operational standards.  Ignite Medical cannot avoid that obligation by characterizing the subject matter as operational detail more suited to a fact witness.

The Court further concludes that testimony regarding HPPD targets is relevant to Plaintiff's claims concerning staffing adequacy at the Ignite facility.  Evidence regarding the staffing benchmarks Ignite Medical is expected to maintain, the individuals or entities responsible for establishing those benchmarks, and the relationship between those targets and actual staffing levels may bear directly on whether the facility operated with adequate staffing during the relevant period. Although the decedent's stay lasted approximately ten days, the defined time frame extending sixty days prior to admission through the duration of the stay is reasonably necessary to establish the staffing framework in place at the time of decedent's residency and whether any departures from establish benchmarks occurred during her stay.  Because the topic is limited to that defined period and seeks information within the scope of Rule 26, Ignite Medical has not demonstrated that preparing a corporate representative to address these matters would impose an undue burden. Ignite Medical's request for a protective order as to Topic 4 is therefore **denied**.

### ii.  Incident Reports and Risk Reports Concerning Resident (Topic 14)

Topic 14 seeks for a corporate representative to describe all incident reports, risk reports, or RYTES reports completed regarding the decedent during her stay, specifically: what triggered each report; the factual findings contained in each report(s); and who completed each report.  Doc. 95, at

5.

Ignite Medical asserts that follow-up actions documented in such reports constitute peer review or quality assurance materials protected from disclosure.  Ignite Medical objects to producing a corporate representative to testify regarding those aspects of the topic but represents that it does not object to providing testimony regarding the existence of incident or RYTES reports completed during the decedent's stay, including what triggered each report and who completed it.

Plaintiff argues that the Ignite facility's reliance on Kansas peer review privilege is misplaced. Plaintiff contends that the privilege protects only deliberative peer review materials, not factual documents such as incident reports that record what occurred and what actions were taken. Plaintiff further argues that the privilege assertion is procedurally deficient because Ignite Medical failed to provide a privilege log or identify specific documents supporting the claim.  Plaintiff maintains that blanket assertions of privilege directed at a Rule 30(b)(6) topic are improper and premature, and that any legitimate privilege concerns are more appropriately addressed through contemporaneous objections to specific questions during the deposition.

The Court concludes that the objection is overbroad.  The Kansas peer review privilege protects the deliberative processes of peer review committees but does not shield the underlying factual information concerning an incident.  *See* K.S.A. § 65-4915; *Adams v. St. Francis Reg'l Med. Ctr.*, 264 Kan. 144, 156–59, 955 P.2d 1169 (1998).  Testimony regarding the existence of incident reports, the circumstances that triggered their creation, the identity of the individuals who prepared them, and the factual events recorded in those reports concern factual matters rather than protected peer review deliberations, and such information falls within the scope of discoverable facts that may be addressed through Rule 30(b)(6) testimony.  The Court construes the Topic's references to "factual findings," to include objective factual information reflected in the reports, but not evaluative conclusions, assessments, or determinations generated through the peer review process.

Ignite Medical likewise cannot avoid preparing a corporate representative by asserting a blanket privilege objection to the topic as a whole.  Privilege must be asserted in response to specific questions that seek protected information, and the propriety of such objections can be addressed during the deposition if necessary.  *McBride v. Medicalodges, Inc.*, 250 F.R.D. 581, 587 (D. Kan. 2008) (holding that blanket privilege objections to Rule 30(b)(6) topics are premature and that privilege objections should be raised to specific questions during the deposition).  To the extent the topic seeks testimony regarding internal peer review committee deliberations, evaluations, or recommendations generated through a protected quality assurance process, Ignite Medical may assert appropriate objections at that time.[16]

Accordingly, the corporate representative must be prepared to testify regarding the factual circumstances surrounding the incident or RYTES reports concerning the decedent, but need not disclose privileged peer review deliberations or recommendations.  Ignite Medical's request for a protective order as to Topic 14 is **granted in part**.

### iii.    Management Fees Paid to Ignite Team Partners (Topic 16)

Topic 16 seeks testimony from a corporate representative regarding (1) whether management fees were paid to Ignite Team Partners in 2022 and 2023, and if not, explain; and (2) whether the Facility Administrator had any input into or ability to negotiate the management fee amount.  Doc. 95, at 6.

Ignite Medical objects to the form of Topic 16.[17]  Subject to and without waiving that

---

[16] If a dispute arises regarding the propriety of an objection, the parties shall proceed with the deposition and preserve the issue for later review.  The Court will address any such disputes, if necessary, after the deposition based on the transcript.

[17] Ignite Medical's "form" objection to a Rule 30(b)(6) topic is not a recognized basis to refuse or limit preparation of a corporate representative.  Objections to the form of questioning or the responsiveness of the answer are properly raised during the deposition pursuant to Federal Rule of Civil Procedure 30(c)(2).  *See* Fed. R. Civ. P. 30(c)(2) (requiring objections to be stated concisely and in a nonargumentative manner); *see also* D. Kan. Deposition Guidelines.  To the extent Ignite Medical seeks to narrow or reframe the scope of

objection, Ignite Medical represents that it will prepare a corporate representative to testify regarding how, if at all, management fees paid to Ignite Team Partners in 2022 and 2023 affected funds available for nursing staff wages or additional staffing, and whether the Facility Administrator had any input into or ability to negotiate the management fee amount.

Plaintiff responds that testimony regarding the structure and operation of management fees and related-party arrangements is necessary to understand how those fees affected the Ignite facility's financial resources and staffing levels.  Plaintiff argues that the Ignite facility cannot meaningfully testify about the "impact" of management fees while refusing to address their form or structure, because the structure of those arrangements determines how funds are allocated and what incentives exist regarding operational costs such as staffing.

Plaintiff further contends that Ignite Medical operated within a corporate structure in which Ignite Team Partners provided management and administrative services, and that payments between those entities reflect that relationship.  Plaintiff further points to Ignite Medical's cost reports and related-party transactions as evidence that management fees and payments to affiliated entities were substantial and partially disallowed by federal regulators, which Plaintiff contends supports discovery into how those financial arrangements were structured and how they affected the facility's operations.

The Court agrees with Plaintiff.  Testimony concerning the existence and operation of management fees paid to an affiliated entity may provide relevant context for evaluating the facility's financial condition and staffing resources during the period at issue.  Ignite Medical's attempt to limit testimony to the impact of management fees while excluding inquiry into the structure of those arrangements is unpersuasive.  The effect of a financial obligation on a facility's resources cannot be

---

Topic 16 through a "form" objection, that approach is improper.

meaningfully assessed without understanding how that obligation was structured and administered. Because the topic is limited to a defined category of payments during a discrete timeframe, the burden of preparing a corporate representative to address these matters is not disproportionate to the needs of the case.  Ignite Medical's request for a protective order as to Topic 16 is therefore **denied**.

      iv.    **"Notes & Loans Payable (Short Term)" Reflected on CMS Forms 2540 (Topic 17)**
            **Other Long-Term Liabilities" Reflected on CMS Forms 2540 (Topic 18)**

Topics 17 and 18 each seek testimony regarding information contained within the Ignite facility's CMS Forms.  Ignite Medical raises substantially similar objections to each — that the topic seeks a detailed breakdown of short-term debts reflected in financial records that fall outside the proper scope of a 30(b)(6) deposition and that the request for testimony regarding long-term liabilities recorded in financial documents exceeds the scope of the claims asserted.

Plaintiff collectively responds that Topics 17 and 18 seek related categories of financial information that are central to his allegation that Ignite Medical was undercapitalized and unable to maintain adequate staffing during the relevant period.  With respect to Topic 17, Plaintiff argues that testimony regarding Ignite Medical's debts and liabilities may reveal whether the facility lacked sufficient operating capital and whether corporate financial decisions or related-party transactions contributed to that condition.  Plaintiff contends that such information bears directly on whether the facility's financial structure limited its ability to support adequate staffing levels.

With respect to Topic 18, Plaintiff argues that CMS cost report data reflects the facility's financial condition, staffing metrics, and operational resources, and that testimony is necessary to explain how those reports were prepared, what information they contain, and how the reported figures relate to the facility's ability to provide care.  Plaintiff contends that cost reports are routinely

relied upon in nursing home litigation and may be explored through deposition testimony for that purpose.  The Court addresses each topic in turn.

Topic 17 seeks testimony from a corporate representative regarding Ignite Medical reporting of "Notes & loans payable (short term)" on CMS Form 2540 as of December 31, 2022, and December 31, 2023, including: whether the reporting is accurate; whether any of these obligations were owed to Ignite Team Partners or affiliated entities; and the circumstances giving rise to the loan and the terms of any related notes.  Doc. 95, at 6.

The Court disagrees with Ignite Medical's argument that Ignite Medical's debts and liabilities are unrelated to the issues in this case.  Plaintiff alleges that Ignite Medical was undercapitalized and unable to maintain adequate staffing as a result of corporate financial decisions.  Plaintiff also points to specific figures that show a significant decline in the Ignite facility's staffing metrics (9.3% FTE decline, 25.7% admission decline, 89% collapse in the facility's permanent contract RN hiring). Financial obligations reflected in the facility's CMS cost reports are relevant to that theory and may bear on whether the facility carried significant liabilities, whether those obligations ran to affiliated entities, and how such financial arrangements affected available operating capital.  Testimony explaining the financial entries may therefore provide relevant context regarding Ignite Medical's financial condition during the period surrounding the decedent's stay.

The topic is also appropriately narrow.  It is tied to specific line items in Ignite Medical's own regulatory filings rather than a broad inquiry into the facility's finances.  Preparing a corporate representative to explain those entries and the circumstances surrounding any related loans does not impose a burden disproportionate to the needs of the case.  Accordingly, Ignite Medical's request for a protective order as to Topic 17 is **denied**.

Topic 18 seeks testimony from a corporate representative regarding Ignite Medical reporting of "Other long-term liabilities" on CMS Form 2540 as of December 31, 2022, and December 31,

2023, including: whether the reporting is accurate; whether any obligations were owed to Ignite Team Partners or affiliated entities; and the circumstances requiring the loan and the terms of the note. Doc. 95, at 6.

The Court finds that testimony explaining the nature of the liabilities reported in the Ignite facility's CMS cost reports may therefore provide relevant context regarding the facility's financial condition during the period surrounding the decedent's stay. The topic is also narrowly tied to specific financial entries in the Ignite facility's own regulatory filings rather than a broad exploration of the facility's finances. Preparing a corporate representative to explain the liabilities reflected in those reports and the circumstances surrounding them does not impose a burden disproportionate to the needs of the case. Accordingly, Ignite Medical's request for a protective order as to Topic 18 is **denied**.

**Ignite Medical's motion for protective order (Doc. 98) is granted in part and denied in part as set forth above.**

### f. Ignite Team Partners, LLC's Motion for Protective Order

The Court next addresses Ignite Team Partners, LLC ("Ignite Team"). Ignite Team is the corporate parent and management company that is alleged to have exercised centralized control over the operations of Ignite Medical, including staffing and financial decisions. Ignite Team challenges Topics 7, 9, 15, 17, 18, 19, and 21 in Plaintiff's Third Amended Rule 30(b)(6) Notice (Doc. 96). These topics concern Ignite Team's access to operational dashboards and reports, management fees, contractual relationships with Ignite Medical, affiliated vendor relationships, CMS cost report entries, and staffing levels. The Court addresses each disputed topic below.

### i. Dashboards, Reports, and Operational Monitoring Systems (Topic 7)

Topic 7 seeks testimony, for the Relevant period, describing dashboards, reports, or systems through which Ignite Team could access Ignite Medical's census, revenue, PPD, SBT%, staffing

levels, or agency utilization; and to identify all personnel from Ignite Team with access to such systems.  Doc. 96, at 5.

Ignite Team does not object to providing testimony regarding how staffing levels are determined.  It contends, however, that the topic improperly seeks detailed information about all dashboards, reports, or systems through which data may be accessed, and that identifying all personnel with system access goes beyond what the claims require.  Ignite Team argues that the manner in which information is accessed and the identities of individuals with system access are not relevant to the claims asserted and render the topic overly broad.

Plaintiff responds that Topic 7 seeks relevant testimony regarding the platforms, dashboards, and reporting systems Ignite Team used to monitor staffing levels at the Ignite facility.  Plaintiff further contends that existing documents indicate corporate personnel actively received and monitored staffing reports and performance metrics, including daily staffing reports emailed to Ignite Team personnel such as Brandy Chuku and Stephen Smith, labor reports reflecting tracking of hours-per-patient-day (HPPD) metrics, and internal communications referencing performance benchmarks such as "SBT" percentages.  According to Plaintiff, this evidence demonstrates that staffing data was monitored at the corporate level through defined reporting mechanisms.

Plaintiff argues that because Ignite Team exercised centralized oversight as the management company, the systems through which it tracked staffing data—and the personnel who had access to those systems—are directly relevant to demonstrating how corporate oversight operated in practice. Plaintiff contends that Rule 30(b)(6) testimony is therefore appropriate to explain what systems were used, what data was tracked, how those metrics were generated, and how the information was reviewed or utilized by corporate management in overseeing facility staffing.

The Court concludes that testimony regarding the systems through which Ignite Team monitored facility performance metrics is within the scope of permissible discovery.  Plaintiff alleges

80

that Ignite Team exercised centralized oversight of staffing and operational performance at Ignite Medical.  If Ignite Team tracked metrics such as census levels, staffing hours, or agency utilization through centralized reporting platforms, testimony describing those systems and the data they provided may bear on the extent of corporate oversight and monitoring.  A Rule 30(b)(6) deposition is an appropriate mechanism for obtaining testimony regarding systems used, the metrics they tracked, and how information was made available to and utilized by corporate personnel.

The Court agrees, however, that requiring Ignite Team to identify every individual with potential access to such systems would extend beyond what is reasonably necessary to explore the relevant issues.  Corporate reporting systems may be accessible to numerous personnel whose access has little connection to operational decision-making or staffing oversight.  Accordingly, Topic 7 is limited to testimony describing the dashboards, reports, or systems used to monitor facility performance metrics and the roles or positions of Ignite Team personnel (such as corporate leadership, cluster management, or finance and operations personnel) responsible for reviewing or utilizing that information.  Ignite Team's request for a protective order as to Topic 7 is therefore **granted in part** consistent with this limitation.

### ii.  Management Fees Paid by the Facility (Topic 9) Contracts and Management Agreement Terms (Topic 15)

Topic 9 seeks testimony describing all management fees Ignite Medical paid to Ignite Team, for the Relevant Period, and how these amounts were calculated.  Doc. 96, at 5.  Topic 15 requests that, during the Relevant Period, a corporate representative identify all contracts between Ignite Team and the Ignite facility and describe the terms of the management agreement and between Ignite Team and the facility, specifically: (i) the method for calculating the management fee; and (ii) the services included in the management fee.  Doc. 96, at 7.

Ignite Team objects to both Topics 9 and 15 as written on the grounds that it is irrelevant,

overbroad, and unduly burdensome.  Ignite Team represents that it will prepare a corporate representative to testify regarding the terms of the management agreement, including the services provided in exchange for the management fee and whether payment of management fees affected funds available for staffing.  Ignite Team contends that it should not be required to provide testimony detailing all management, consulting, administrative, royalty, other fees, or the precise amounts paid monthly, because such information is not relevant to the claims asserted.

Plaintiff collectively responds to both topics arguing that testimony regarding the management agreement between Ignite Team and Ignite Medical, including the services provided and the fees charged, is directly relevant to the complaint's allegations that corporate financial arrangements affected Ignite Medical's ability to maintain adequate staffing.  Plaintiff argues that Ignite Team, as the entity that structured and received the management fees, must be prepared to testify not only about the existence of those fees but also about their amounts and calculation methods, because those details are necessary to evaluate how the agreement operated and how the payments may have affected the facility's financial resources.

Plaintiff further points to financial information reflected in the Facility's CMS cost reports, which Plaintiff contends demonstrates that Ignite Team imposed substantial management fees on the facility during the relevant period.  Specifically, Plaintiff notes that the facility reported paying management fees of approximately $624,800 in 2022 and $605,000 in 2023, and that CMS disallowed approximately $250,715 in 2022 and $252,609 in 2023—representing a disallowance rate of roughly 40% to 42%.  Plaintiff argues that these figures support its contention that the fee structure may have been excessive and that testimony is necessary to explain how the fees were calculated, what services were provided, and how those payments affected the Facility's available operating resources.

The Court is not persuaded by Ignite Team's arguments.  Plaintiff alleges that corporate

financial arrangements affected the Ignite facility's operational resources and its ability to maintain adequate staffing levels.  Management fees paid to an affiliated entity may bear directly on that allegation because such payments could influence the funds available for staffing and other operational expenses.  Plaintiff's response reflects that the facility paid substantial management fees, a significant portion of which was disallowed by CMS as excessive, which further supports inquiry into how those fees were calculated and what funds were transferred.  For similar reasons, testimony regarding the terms of the management agreement, including the services provided in exchange for those fees, may provide necessary context to evaluate the nature and purpose of the payments.  Testimony limited to the existence of a management agreement, without inquiry into how the fees were calculated or the magnitude of the payments, would provide little meaningful context for evaluating those allegations.

Ignite Team's proposal to permit testimony regarding only the "terms" of management fees while excluding inquiry into the amount or calculation of those fees is not workable.  The effect of a financial obligation on a facility's resources cannot be meaningfully assessed without understanding how the obligation was structured and the amount of funds transferred pursuant to it.  Accordingly, Topics 9 and 15 seek relevant discovery concerning the structure, calculation, and implementation of management fees.  Ignite Team's request for a protective order as to Topics 9 and 15 are therefore **denied**.

### iii.  Affiliated Vendor Relationships – Spark Therapy LLC (Topic 17)

Topic 17 seeks testimony regarding Ignite Team's ownership interest in, control over, or common ownership with Spark Therapy LLC, for the Relevant Period, specifically: when this relationship was established; and the business purpose for requiring the Facility to obtain all physical therapy, occupational therapy, and speech therapy services exclusively from Spark Therapy LLC, if any.  Doc. 96, at 6-8.

Ignite Team objects to Topic 17 as irrelevant, overbroad, and unduly burdensome. Ignite Team contends that this case concerns the treatment and monitoring of a wound allegedly present prior to the decedent's admission and does not involve occupational, physical, or speech therapy services and that inquiry into matters related to those services is not relevant to the claims asserted and exceeds the scope of proportional discovery.

Plaintiff responds that testimony regarding therapy service arrangements is relevant because payments to related entities for therapy services may have affected the Ignite facility's financial resources and overall staffing capacity. Plaintiff points to payments reflected in the Facility's CMS cost reports showing that Ignite facility paid Spark Therapy LLC approximately $2,100,979 in 2022 and $1,862,943 in 2023, and that CMS disallowed approximately $337,606 in 2022 and $307,279 in 2023 of those charges as excessive. Plaintiff contends that these figures support an inference that the therapy service fees may have been excessive and that corporate financial arrangements reduced the facility's available resources, contributing to understaffing.

The Court concludes that limited testimony regarding the corporate relationship between Ignite Team and Spark Therapy is within the scope of permissible discovery subject to a limitation described below. Plaintiff alleges that Spark Therapy's financial arrangement affected Ignite Medical's operational resources during the relevant period. If Ignite Team possessed an ownership interest in Spark Therapy and required Ignite Medical to utilize that entity for therapy services, such an arrangement could bear on whether payments to affiliated entities affected the facility's financial resources. The cost reports reflect that the facility made substantial payments to Spark Therapy, a portion of which was disallowed by CMS as excessive, which supports inquiry into whether those payments affected the resources available for facility operations. Testimony concerning the existence and structure of that relationship may therefore provide relevant context regarding the financial arrangements between the entities and their effect on the facility's resources.

84

The Court agrees, however, that the topic should not extend to the details of therapy services provided to residents.  The allegations in this case concern wound care and monitoring rather than the provision of therapy services, and discovery into the clinical aspects of those services would exceed the scope of proportional discovery.  Accordingly, testimony under Topic 17 is limited to (1) nature and structure of Ignite Team's ownership interest in or control over Spark Therapy; (2) what that relationship was established; (3) the contractual or financial arrangements governing Ignite Medical's use of Spark Therapy; and (4) the business purpose for any exclusive-provider requirement.  Ignite Team's request for a protective order as to Topic 17 is therefore **granted in part**.

### iv.  CMS Cost Report – "Due from Other Funds" (Topic 18)

Topic 18 seeks testimony regarding the Ignite facility's report of "Due from Other Funds" on its 2022 and 2023 CMS Forms 2540, including: whether the reporting is accurate; which affiliated entities owed funds; when the receivables arose; whether they were collected; and how this intercompany receivable position affected the Facility's cash available for staffing and operations during the decedent's stay.  Doc. 96, at 9.

Ignite Team contends that the topic extends beyond the proper scope of a corporate representative deposition and seeks detailed financial information unrelated to the claims at issue. Ignite Team maintains that the only relevant inquiry is whether any "due from other funds" or intercompany receivable position affected staffing or operations, and that such testimony can be provided without requiring explanation of the nature and source of the funds, the identity of entities involved, or the timing of receivables.

Plaintiff responds that testimony regarding intercompany receivables and "due from other funds" entries is necessary to evaluate whether intercompany financial arrangements affected Ignite Medical's operations and staffing.  Plaintiff argues that Ignite Team cannot meaningfully address the

impact of such receivables without explaining their underlying details, including the nature and source of the funds, which entities owed them, and when the receivables arose or were collected. Although Plaintiff does not identify specific dollar amounts associated with these entries, Plaintiff contends that the amounts reflected in the facility's cost reports and financial statements represent intercompany balances that could have affected available operating capital.  Plaintiff contends these facts are necessary to determine whether intercompany financial flows reduced the facility's available operating capital and therefore bear directly on the allegation that corporate financial practices contributed to understaffing.

The Court is not persuaded by Ignite Team's proposed limitation.  On CMS cost reports, "due from other funds" entries reflect amounts owed to the facility that may not yet be available for operational use.  Plaintiff alleges that corporate financial practices and intercompany financial arrangements affected Ignite Medical's operational resources and staffing levels.  A facility carrying a significant intercompany receivable may have had less cash available for operational expenses, including staffing.   Testimony explaining the nature of those receivables, the entities involved, and the circumstances under which they arose may therefore provide relevant context regarding Ignite Medical's financial condition.

The topic is narrowly tied to specific financial entries appearing in Ignite Medical's CMS cost reports rather than a broad exploration of the facility's finances.  Preparing a corporate representative to explain those entries and the circumstances surrounding them does not impose a burden disproportionate to the needs of the case.  Ignite Team's request for a protective order as to Topic 18 is therefore **denied**.

### v.   CMS Cost Report – Net Loss and Management Fees (Topic 19)

Topic 19 seeks testimony regarding whether Ignite Medical reported and sustained net losses on patient care operations in 2022 and 2023 while simultaneously paying management fees to Ignite

Team, and whether Ignite Team considered reducing management fees to allow the facility to increase staffing or improve patient care. Doc. 96, at 9.

Ignite Team objects to Topic 19 as irrelevant, overbroad, and unduly burdensome. Plaintiff responds that Ignite Team's objection is unsupported and conclusory. Plaintiff argues that Ignite Team provides no factual explanation, legal authority, or evidence demonstrating that the topic is irrelevant or unduly burdensome. Plaintiff contends that because the party seeking a protective order bears the burden of showing that discovery is improper, Ignite Team's failure to substantiate its objection means the request should not be limited and the topic should proceed.

Substantively, the Court finds that Topic 19 seeks relevant discovery. Plaintiff alleges that corporate financial arrangements, including management fees paid to Ignite Team, affected Ignite Medical's operational resources and contributed to inadequate staffing. The topic bears on Plaintiff's theory that corporate financial decisions affected the resources available for staffing and resident care. Testimony concerning whether Ignite Team considered modifying those fees in response to Ignite Medical's financial condition may shed light on the degree of financial oversight exercised by the management entity.

Procedurally, the Court concludes that Ignite Team has not met its burden to justify a protective order. *See Layne Christensen Co.*, 271 F.R.D. at 244 (stating the burden is on the party seeking a protective order). Ignite Team's objections that the topic is irrelevant and unduly burdensome are conclusory and unsupported. Ignite Team has not identified any specific burden associated with preparing a corporate representative to address the Ignite facility's financial performance and the management fees it received.

Because the topic concerns a discrete financial issue during a defined time period, the Court finds that preparing a corporate representative to address these matters does not impose a burden disproportionate to the needs of the case. Ignite Team's request for a protective order as to Topic

87

19 is therefore **denied**.

### vi.    Full-Time Equivalent (FTE) Staffing Levels (Topic 21)

Topic 21 seeks testimony regarding the Facility's reported Full-Time Equivalent (FTE) staffing levels for 2022 (72.21 FTE) and 2023 (65.49 FTE), including: whether the reporting is accurate; Ignite Team's role in determining FTE levels; how those levels were calculated relative to certified beds and census; and whether Ignite Team established FTE targets or limits.  Doc. 96, at 9.

Ignite Team objects to Topic 21 as irrelevant, overbroad, and unduly burdensome.  Ignite Team contends that the case concerns the treatment and monitoring of an existing wound during the decedent's August 29 through September 7, 2023 stay, and that inquiry into facility-wide FTE staffing levels for 2022 and much of 2023 is not relevant to the period stated.  Ignite Team further states it has agreed to produce a corporate representative to describe the method used to determine required nursing staff levels during the decedent's stay, including whether staffing decisions were based on census, resident acuity, two-person assists, budget constraints, and how the decedent's specific care needs were incorporated.  Ignite Team argues that broader inquiry into historical FTE calculations is unnecessary and should be limited.

Plaintiff responds that discovery regarding FTE staffing levels beyond the dates of the decedent's stay is relevant because the complaint alleges systemic understaffing rather than isolated negligence during a brief period.  Plaintiff argues that examining staffing levels over a broader timeframe is necessary to determine whether staffing deficiencies reflected an ongoing pattern tied to corporate financial decisions and management practices.  Plaintiff further contends that courts in similar nursing home negligence cases have permitted discovery spanning months surrounding the relevant events to evaluate staffing trends and corporate oversight, and that such longitudinal staffing data is necessary to assess whether staffing conditions deteriorated over time.

The Court concludes that the requested testimony falls within the scope of discovery

88

provided there is a narrower temporal limitation.  Plaintiff alleges that the Ignite facility suffered from systemic understaffing tied to corporate financial and management decisions.  Where such allegations are asserted, discovery limited solely to the precise dates of the decedent's stay would provide little insight into whether staffing levels reflected an isolated circumstance or part of a broader pattern.  *See Murray, LLC*, 2020 WL 1819884, at *5-6 (approving a six-month temporal scope as "not facially objectionable" and "quite conservative" where plaintiff alleged systemic understaffing).  Information regarding staffing levels over a reasonable period surrounding the decedent's stay may therefore be relevant to evaluating whether staffing conditions were chronically inadequate.  However, the Court agrees that a multi-year timeframe exceeds what is reasonably necessary to explore these issues, particularly given the limited duration of the decedent's stay.  Consistent with *Murray*, the appropriate scope is a defined period reasonably proximate to the decedent's residency rather than multiple reporting years.

The topic also concerns staffing metrics reflected in the Ignite facility's regulatory cost reports rather than day-to-day staffing decisions for individual residents.  Testimony explaining how those Full-Time Equivalent figures were calculated, whether the reporting was accurate, and whether Ignite Team established staffing targets or limits may shed light on the Ignite facility's overall staffing framework and the role corporate management played in determining staffing levels.  However, the Topic is limited to the six months prior to the decedent's residency.  With this limitation, preparing a corporate representative to address these matters does not impose a burden disproportionate to the needs of the case.  Ignite Team's request for a protective order as to Topic 21 is therefore **granted in part**.

**It is therefore ordered that Ignite Team's motion for protective order (Doc. 97) is granted in part and denied in part.**

IV.    **The Case Schedule**

89

The Court is now in the position to move this case back on track. In a prior order, the Court suspended the existing case deadlines, pending resolution of the parties' discovery disputes. *See* Doc. 81. The motions addressed herein represent the final discovery-related matters requiring resolution before the case may proceed under a revised schedule. Given the posture of the case and that the parties have not conferred on any case schedule, the Court will not make any final scheduling determinations at this time.

Under the circumstances, the Court orders the parties to confer and submit a proposed scheduling order and joint status report by **April 24, 2026**. The joint status report shall identify any outstanding issues and summarize all remaining discovery to be completed. The parties may note any points of disagreement in the proposed scheduling order and include a brief explanation of their respective positions. They should also provide proposed dates for the corporate representatives to be designated and the Rule 30(b)(6) depositions to be completed. Given the length of time this case has been pending and the amount of discovery already conducted, the Court is not inclined to enter a lengthy schedule. The parties should take this guidance into account when drafting their proposed schedule. Upon review of the joint status report and proposed scheduling order, the Court will either enter an amended schedule or set a scheduling conference.

## V.    Conclusion

To summarize, the Court has carefully reviewed each challenged Rule 30(b)(6) topic and the parties' respective arguments regarding relevance, proportionality, and reasonable particularity. In the end, the Court found persuasive arguments from all parties and ruled as set forth above. Additionally, the Court set deadlines for the parties to submit a joint status report and proposed scheduling in anticipation of the scheduling conference. The Court hopes the parties will be able to move this case forward in an efficient and amicable manner.

**IT IS THEREFORE ORDERED** that the motions for a protective order (Docs. 97-102)

are **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that the parties confer and submit a proposed scheduling order and joint status report by **April 24, 2026**.  The joint status report shall identify any outstanding issues and summarize all remaining discovery to be completed.  The parties should also provide proposed dates for the corporate representatives to be designated and the Rule 30(b)(6) depositions to be completed.  Given the length of time this case has been pending and the amount of discovery already conducted, the Court is not inclined to enter a lengthy schedule.  The parties should take this guidance into account when drafting their proposed schedule.  Upon review of the joint status report and proposed scheduling order, the Court will either enter an amended schedule or set a scheduling conference.

**IT IS SO ORDERED.**

Dated April 9, 2026, at Wichita, Kansas.

/s/ BROOKS SEVERSON
Brooks G. Severson
United States Magistrate Judge

91